# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-1428

G.M. ENTERPRISES, INC.,

*Plaintiff-Appellant*,

v.

TOWN OF ST. JOSEPH, WISCONSIN,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 02-C-0396-S—**John C. Shabaz**, *Judge.*

ARGUED SEPTEMBER 16, 2003—DECIDED NOVEMBER 25, 2003

Before FLAUM, *Chief Judge*, and DIANE P. WOOD and WILLIAMS, *Circuit Judges.*

FLAUM, *Chief Judge.* G.M. Enterprises, Inc., owner of the Cajun Club of the Town of St. Joseph, Wisconsin, appeals the District Court's grant of summary judgment to the Town upholding the constitutionality of two town ordinances. G.M. argues that Ordinance 2001-02, which regulates the manner in which nude dancers perform in any "sexually oriented business," and Ordinance 2001-03, which prohibits establishments licensed to sell alcoholic beverages from permitting nude dancing on the premises, violate the First and Fourteenth Amendments. We conclude that the record supports the Town's claim that the ordinances are

not an attempt to regulate the expressive content of nude dancing, but that the Town had a reasonable basis for believing that the ordinances will reduce the undesirable "secondary effects" associated with sexually oriented businesses, and therefore, we affirm.

## I. Background

In 1999, the Town Board ("Board") of the Town of St. Joseph ("Town"), an unincorporated town in Wisconsin, began to consider whether to regulate sexually oriented businesses located within its borders. The Board collected sixteen studies regarding the relationships between sexually oriented businesses and property values, crime statistics, public health risks, illegal sexual activities such as prostitution, and organized crime. These studies, undertaken in various communities throughout the country, demonstrated a correlation between sexually oriented businesses and negative secondary effects. The Board also consulted a number of judicial opinions from other jurisdictions that address adverse secondary effects associated with sexually oriented businesses. Further, the Board considered police reports of calls made in regards to each licensed liquor establishment in St. Joseph for the period of 1989 through 1999, furnished by the St. Croix County Sheriff's Department. The sheriff informed the Board that the sheriff department had "received far more calls regarding the Cajun Club [the Town's sole sexually oriented business licensed to sell alcoholic beverages] than we have for the other liquor establishment in the Town of St. Joseph that do[es] not offer sexually oriented entertainment such as nude dancing." The studies, judicial opinions, and police reports were available to members of the Board for their consideration.

In June 2001, the Board adopted Ordinance 2001-02, which was codified under the town code, Chapter 153, en-

titled "Sexually Oriented Businesses." "Sexually oriented businesses," as defined by § 153-4, include "business[es] featuring adult entertainment." "Adult entertainment," as defined by § 153-4, is any "live performance, display or dance of any type which has as a significant or substantial portion . . . characterized by an emphasis on . . . viewing of specified anatomical areas." § 153-4. According to § 153-4, "[s]pecified anatomical areas" include:

> A. The human male genitals in a discernible turgid state, even if fully and opaquely covered; or
>
> B. Less than completely and opaquely covered human genitals, pubic region, anus, anal cleft or cleavage; or
>
> C. Less than completely and opaquely covered nipples or areolas of the human female breast.

Ordinance 2001-02, published in Section 153-3(A), prohibits sexually oriented businesses from allowing any:

> person, employee, entertainer or patron . . . to have any physical contact with any entertainer on the premises of a sexually oriented business during any performance . . . all performances shall occur on a stage or table that is elevated at least 18 inches above the immediate floor level and shall not be less than 5 feet from any area occupied by any patron.

Further, § 153-5(B) prohibits the "sale, use or consumption of alcoholic beverages on the premises of a sexually oriented business."

The Board stated in § 153-1 that its motivation for passing this ordinance was that it:

> finds that sexually oriented businesses are frequently used for unlawful sexual activities . . . and . . . concern over sexually transmitted diseases is a legitimate health concern of the Town Board . . . there is convinc-

ing documented evidence that sexually oriented businesses have a deleterious effect on both the existing businesses around them and the surrounding residential areas adjacent to them, causing increased crime and the downgrading of property values; and, whereas, the Town Board desires to minimize and control these adverse secondary effects. . . and, whereas it is not the intent of this chapter to suppress any speech activities protected by the First Amendment, but to . . . address[ ] the negative secondary effects of sexually oriented businesses.

Concurrent with the adoption of Ordinance No. 2001-02, the Board adopted Ordinance No. 2001-03, codified under Chapter 114, Article VI of the town code, entitled "Nude Dancing in Licensed Establishments Prohibited." Ordinance No. 2001-03 applies to "[a]ny establishment licensed by the Town Board . . . to sell alcohol beverages." § 114-19. Under Ordinance No. 2001-03,

[i]t is unlawful for any person to perform or engage in . . . any live act, demonstration, dance or exhibition on the premises of a licensed establishment which:

A. Shows his/her genitals, pubic area, vulva, anus, anal cleft or cleavage with less than a fully opaque covering.

B. Shows the female breast with less than a fully opaque covering of any part of the nipple and areola.

C. Shows the human male genitals in a discernibly turgid state, even if fully and opaquely covered.

§ 114-17. The Board expressed its intent in regards to Ordinance 2001-03 by stating in Section 114-16 that:

the Town Board is aware, based on the experiences of other communities, that bars and taverns, in which live,

totally nude, non-obscene, erotic dancing occurs may and do generate secondary effects which the Town Board believes are detrimental to the public health, safety and welfare . . . the Town Board desires to minimize, prevent and control these adverse effects . . . the Town Board has determined that the enactment of an ordinance prohibiting live, totally nude, non-obscene, erotic dancing in bars and taverns licensed to serve alcoholic beverages promotes the goal of minimizing, preventing and controlling the negative secondary effects associated with such activity.

The plaintiff in this action, G.M. Enterprises, operates the Cajun Club ("Club") of St. Joseph. The Club enjoys a St. Joseph liquor license and, for 16 years, has served alcohol and offered semi-nude, topless dance entertainment. It is uncontested that G.M. is a "sexually oriented business" subject to Ordinances Nos. 2001-02 and 2001-03, as its dancers expose "specified anatomical areas." G.M. filed a complaint in the United States District Court, Western District of Wisconsin, pursuant to 42 U.S.C. § 1983, seeking declaratory and injunctive relief and alleging that the ordinances are unconstitutional. The complaint alleged that the Board did not rely on adequate evidence to demonstrate the necessity of the ordinances to combat adverse secondary effects; that the ordinances prohibit more expression than is necessary to combat any adverse secondary effects that might be caused by adult entertainment; and further that Ordinance No. 2001-03 expressly conditions the grant of a liquor license, a government benefit, on the surrender of the constitutional right to freedom of expression.

The Town moved for summary judgment, arguing that the Board relied on an adequate evidentiary foundation to reasonably believe that the ordinances would reduce adverse secondary effects. In support of its motion, the Town submitted an affidavit by the city clerk attesting to the

Board's access to the studies, cases, and police reports relied upon in its deliberations, and further that every member of the Board "spent time reviewing the materials." The Town also submitted an affidavit by the county sheriff attesting to the fact that more police calls were made in regards to the Club than any other liquor establishment in the Town.

In its opposition to the Town's motion, G.M. questioned the Board's conclusion that the ordinances would have the effect of minimizing adverse secondary effects. G.M. argued that the Board did not actually review or rely on the studies and cases that it gathered. G.M. presented a study by Bryant Paul, Daniel Linz & Bradley Shafer that finds the majority of the studies the Board collected "fundamentally unsound," and methodologically flawed, and also submitted an affidavit of Daniel Linz that discusses the study. G.M. further argued that the Board's findings are contrary to the locality's actual experience, and, in support, referred to a 1993 study of the county where the Club is located that states that "St. Croix county has not experienced any major problems with adult entertainment establishments." In addition, G.M. submitted an affidavit stating that the property values near the Club have increased over time. G.M. contested the Town's inference that the Club's entertainment generates secondary effects by submitting an affidavit of the president of G.M. Enterprises which stated that the majority of calls to the police regarding incidents at the Club were generated during the hours when no nude or semi-nude dancing entertainment was offered. G.M. also submitted a statement by the sheriff that the volume of police calls generated by the Club were unrelated to nude dancing.

The district court entered judgment in favor of the Town, finding that the ordinances do not impermissibly infringe on G.M.'s constitutional rights, and further that G.M.'s challenge to the Town's secondary effects rationale did not

raise an issue of material fact to allow the case to proceed to trial. G.M. now appeals.

## II.  Discussion

We review the District Court's grant of summary judgment *de novo*, construing the facts in the record in favor of G.M., the non-moving party. *Ben's Bar v. Village of Somerset*, 316 F.3d 702, 707 (7th Cir. 2003).

Nude dancing is expressive conduct "within the outer ambit of the First Amendment's protection." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000). The ordinances at issue regulate nude dancing in two ways. If a dancer exposes any "specified anatomical area," then the establishment where he or she performs must (1) not sell any alcoholic beverages, § 153-3(B), § 114-17, and (2) require that he or she perform on a stage at least eighteen inches above and five feet away from patrons, as required by § 153-3(A). However, neither requirement is implicated if dancers cover all "specified anatomical areas" during performances, and neither ordinance prohibits nude dancing outright.

Still, plaintiff argues that Ordinances Nos. 2001-02 and 2001-03 regulate constitutionally protected activity. We disagree. The requirement that dancers wear pasties and G-strings has only a "*de minimis*" effect on the expression conveyed by nude dancing. *Pap's A.M.*, 529 U.S. at 294; *Ben's Bar*, 316 F.3d at 708. Further, the "First Amendment does not entitle . . . dancers, or . . . patrons, to have alcohol available during a 'presentation' of nude or semi-nude dancing." *Ben's Bar*, 316 F.3d at 726. And, while the constitutionality of a restriction prohibiting physical contact between nude dancers and their patrons is an issue of first impression in this circuit, the Fifth Circuit has twice had the occasion to consider similar restrictions and has found

them to be constitutional on the grounds that physical contact is beyond the scope of the protected expressive activity of nude dancing. *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1253 (5th Cir. 1995); *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 484 (5th Cir. 2002). Yet, as these regulations do have an incidental effect on protected expression, they must meet constitutional standards to be upheld.

The parties submit that, in order to determine the correct constitutional analysis to apply to the ordinances at issue, this Court must first decide whether the ordinances intend to regulate the expressive element of nude dancing, or whether they are neutral as to content. In the Town's view, the ordinances seek to regulate only the adverse secondary effects associated with nude dancing, and are thus content neutral. In support, the Town cites *City of Renton v. Playtime Theatres*, 475 U.S. 41 (1986). In *Renton*, the Supreme Court held that an adult entertainment zoning ordinance was a "'content-neutral' regulation of speech because while 'the ordinance treats theaters that specialize in adult films differently from other kinds of theaters . . . .[it] is aimed not at the *content* of the films shown . . . but rather at the *secondary effects* of such theaters on the surrounding community.'" *Ben's Bar*, 316 F.3d at 716 (quoting *Renton*, 475 U.S. at 47) (emphasis in original). In contrast, the plaintiff argues that the secondary effects rationale of *Renton* is no longer good law, and further that the ordinances are content based and therefore subject to strict scrutiny.

In light of the Supreme Court's divided ruling in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), we need not decide whether the ordinances are content based or content neutral, so long as we first conclude that they target not "the activity, but . . . its side effects," *see Alameda Books*, 535 U.S. at 447 (Kennedy, J., concurring in

the judgment), and then apply intermediate scrutiny. In *Alameda Books*, the plurality upheld at summary judgment a Los Angeles ordinance that prohibited multiple adult entertainment businesses from operating in the same building. The plurality assumed the ordinance to be content neutral, but did not consider the issue directly due to the fact that the Ninth Circuit had not addressed it below. *Alameda Books*, 535 U.S. at 434, 441. However, the plurality reaffirmed that the first step of the *Renton* analysis is to verify that the "predominate concerns motivating the ordinance were with the secondary effects of adult speech, and not with the content of the adult speech." *Alameda Books*, 535 U.S. at 440-41 (internal quotations omitted). In his concurring opinion, Justice Kennedy agreed that the *Renton* test provided the appropriate level of scrutiny for a regulation that is "targeted not at the activity, but at its side effects." *Alameda Books*, 535 U.S. at 447. And, employing an approach similar to the plurality's, Justice Kennedy insisted that a municipality first "advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact," before a court applies intermediate scrutiny. *Id.* at 449. Although, unlike the plurality, Justice Kennedy wrote that zoning ordinances of adult businesses are "content based," *see id.*, he agreed with the plurality that "[n]evertheless, . . . the central holding of *Renton* is sound: A zoning ordinance that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny." *Id.* at 448. As Justice Kennedy's concurrence is the narrowest opinion joining the judgment of the Court, it is the controlling authority under *Marks v. United States*, 430 U.S. 188, 193 (1976). *Ben's Bar*, 316 F.3d at 722.

Under the first step of the analysis set forth by both Justice Kennedy and the plurality, we must first determine

whether the ordinances at issue are motivated by an interest in reducing the secondary effects associated with the speech, rather than an interest in reducing the speech itself, before turning to *Renton*. *See Alameda Books*, 535 U.S. at 440-41, 450. To survive this step of the analysis, "the rationale of the ordinance must be that it will suppress secondary effects—and not by suppressing speech." *Id.* at 450. The Town has met this burden. Neither of the ordinances prohibit nude dancing; rather, they merely seek to minimize the factors that the Board believed would heighten the probability that adverse secondary effects would result from nude dancing: physical proximity between the dancers and patrons, and the consumption of alcohol by patrons. Requiring that adult entertainment establishments maintain a minimal physical buffer between patrons and dancers does not reduce the availability of nude dance entertainment. And, "alcohol prohibition is, as a practical matter, the least restrictive means of furthering the . . . interest in combating the secondary effects resulting from the combination of adult entertainment and alcohol consumption." *Ben's Bar*, 316 F.3d at 725. Further, if all dancers choose to wear the *de minimus* clothing necessary to cover all "specified anatomical parts," then neither the physical proximity nor alcohol prohibition requirements are implicated. Thus, as the ordinances will leave the availability of nude dance entertainment substantially the same, under Justice Kennedy's test of "how speech will fare under the city's ordinance[s]," *Alameda Books*, 535 U.S. at 450, the Town has demonstrated that its goal is to minimize secondary effects, rather than the speech itself.

Therefore, we move to the second step of the *Renton* analysis. In *Renton*, the Court set forth the intermediate scrutiny test for zoning regulations of adult businesses aimed at suppressing secondary effects. Such regulations are constitutional "so long as they are designed to serve a

substantial government interest and do not unreasonably limit alternative avenues of communication." *Renton*, 475 U.S. at 47, *reaffirmed in Alameda Books*, 535 U.S. at 434. Regulations of public nudity, however, are analyzed under the intermediate scrutiny test of *United States v. O'Brien*, 391 U.S. 367 (1968). *Pap's A.M.*, 529 U.S. at 289. The *O'Brien* test asks (1) whether the regulating body had the power to enact the regulation; (2) whether the regulation furthers an important or substantial governmental interest; (3) whether that interest is unrelated to the suppression of free expression; and (4) whether the regulation's incidental impact on expressive conduct is no greater than is essential to the furtherance of that interest. *O'Brien*, 391 U.S. at 377.

Ordinances Nos. 2001-02 and 2001-03 are neither public indecency nor zoning regulations. They regulate the manner in which patrons view nude dancing; specifically, the patron's physical proximity to the nude dancer and the patron's access to alcoholic beverages in establishments where nude dancing is provided. Because this case concerns only the "substantial government interest" prong that is found in both the *O'Brien* and *Renton* tests, we need not decide which test of intermediate scrutiny provides the correct analytical framework for these ordinances. Indeed, this Court has held that the constitutional standard for "evaluating adult entertainment regulations, be they zoning ordinances or public indecency statutes, are virtually indistinguishable." *Ben's Bar*, 316 F.3d at 714.

The issue before this Court is what quality and quantum of evidence a regulating body must consider in order to demonstrate that it has a reasonable basis for believing that the regulated activity generates adverse secondary effects, the reduction of which is a "substantial government interest" under the *Renton* or *O'Brien* tests. This issue was most recently before the Supreme Court in *Alameda Books;* in the plurality's words, the case required the court to

"clarify the standard for determining whether an ordinance serves a substantial government interest under *Renton*." *Alameda Books*, 535 U.S. at 433. In *Alameda Books*, the plurality reaffirmed that "a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest." *Alameda Books* at 438, (quoting *Renton*, 475 U.S. at 51-52). The plurality upheld an ordinance that prohibited the operation of multiple adult entertainment business in the same building, even though the regulating body did not rely upon a study that specifically addressed whether the concentration of such establishments in a single building would result in a higher incidence of adverse secondary effects. *Id.* at 437. According to the plurality, it was reasonable for the regulating body to infer—from a somewhat dated study that concluded that the concentrated growth of adult entertainment establishments in a particular neighborhood led to increased crime there—that the concentration of adult establishments in a single building would lead to a similar increase in crime. *Id.* at 435-38. The plurality did not require that a regulating body rely on research that targeted the exact activity it wished to regulate, so long as the research it relied upon reasonably linked the regulated activity to adverse secondary effects.

However, the plurality cautioned that:

> a municipality's evidence must fairly support the municipality's rationale . . . . If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standards set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to

> supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Id.* at 438-39. Plaintiff argues that it has "substantially challenged the validity of the town's determination that its regulation was justified by the need to combat adverse secondary effects of adult entertainment," and has therefore precluded summary judgment by shifting the burden back to the Town to supplement the record. We disagree. Plaintiff submitted some evidence that might arguably undermine the Town's inference of the correlation of adult entertainment and adverse secondary effects, including a study that questions the methodology employed in the numerous studies relied upon by the Board; evidence of an increase of property values near the Club; and evidence that the majority of police calls in regards to the Club originated during periods of time when no semi-nude dancing occurred. Although this evidence shows that the Board might have reached a different and equally reasonable conclusion regarding the relationship between adverse secondary effects and sexually oriented businesses, it is not sufficient to vitiate the result reached in the Board's legislative process.

*Alameda Books* does not require a court to re-weigh the evidence considered by a legislative body, nor does it empower a court to substitute its judgment in regards to whether a regulation will best serve a community, so long as the regulatory body has satisfied the *Renton* requirement that it consider evidence "reasonably believed to be relevant to the problem" addressed. *See Renton*, 475 U.S. at 51-52, *see also Alameda Books*, 535 U.S. at 445 (Kennedy, J., concurring in the judgment) ("in my view, the plurality's application of *Renton* might constitute a subtle expansion, with which I do not concur."). Wrote Justice Kennedy, "as a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city

planners . . . the Los Angeles City Council knows the streets of Los Angeles better than we do." *Alameda Books*, 535 U.S. at 451. The plurality expressed similar support for judicial deference to local lawmakers: "we must acknowledge that the Los Angeles City Council is in a better position than the Judiciary to gather and evaluate data on local problems." *Id.* at 440.

Plaintiff argues that its complaint must survive summary judgment because the evidence relied upon by the Board does not meet the standards of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Under the plaintiff's view, the Town cannot demonstrate a reasonable belief in a causal relationship between the activity regulated and secondary effects, as required by *Alameda Books* and *Renton*, unless the studies it relied upon are of sufficient methodological rigor to be admissible under *Daubert.* This argument is completely unfounded. The plurality in *Alameda Books* bluntly rejected Justice Souter's suggestion that the municipality be required to present empirical data in support of its contention: "such a requirement would go too far in undermining our settled position that municipalities must be given a 'reasonable opportunity to experiment with solutions' to address the secondary effects of protected speech." *Alameda Books*, 535 U.S. at 439. Further, the purpose of the evidentiary requirement of *Alameda Books* is to require municipalities to demonstrate reliance on some evidence in reaching a reasonable conclusion about the secondary effects. The municipality need not "prove the efficacy of its rationale for reducing secondary effects prior to implementation." *Ben's Bar*, 316 F.3d at 720. A require-ment of *Daubert*-quality evidence would impose an unrea-sonable burden on the legislative process, and further would be logical only if *Alameda Books* required a regulat-ing body to prove that its regulation would—undeniably—reduce adverse secondary effects. *Alameda Books* clearly did not impose such a requirement.

### III.  Conclusion

For the reasons discussed, the judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*