In the

# United States Court of Appeals
## For the Seventh Circuit

No. 03-2772

R.V.S., L.L.C.,

*Plaintiff-Appellant,*

*v.*

CITY OF ROCKFORD,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 03 C 50048—**Philip G. Reinhard**, *Judge.*

ARGUED DECEMBER 9, 2003—DECIDED MARCH 17, 2004

Before FLAUM, *Chief Judge*, and BAUER and ROVNER, *Circuit Judges.*

FLAUM, *Chief Judge.* Plaintiff R.V.S., L.L.C. ("RVS") filed suit against the City of Rockford ("Rockford") seeking a temporary restraining order and to preliminarily and permanently enjoin Rockford from enforcing an ordinance regulating "Exotic Dancing Nightclubs." Rockford Ordinance 2002-308-0 ("the Ordinance") prohibits the operation of those businesses within 1000 feet of churches, schools, residences and other Exotic Dancing Nightclubs, and in addition, requires the issuance of a special use permit before such businesses may operate in nonproscribed

locations. RVS argues that the Ordinance violates its rights under the First Amendment to the United States Constitution and appeals the district court's judgment in favor of Rockford. For the reasons stated herein, we reverse the judgment of the district court and remand the case for entry of judgment consistent with this opinion.

## I.  Background

A.  The Ordinance

RVS leases commercial property on Auburn Street in Rockford, Illinois. RVS was preparing to open a business at the Auburn Street location called Moulin Rouge. According to RVS's owner, James Roddy, Moulin Rouge planned to be an "upscale" facility serving food along with "theme dancing" and "artistic performances." On December 12, 2002, in response to an application for a liquor license, RVS received a letter from the Rockford City Attorney explaining that a new ordinance enacted the previous day would prevent RVS from opening Moulin Rouge.

This newly passed ordinance defined, for the first time, a category of businesses known as Exotic Dancing Nightclubs and required that such businesses apply for a special use permit. By definition, the Ordinance only applies to dancers who are clothed—nude and semi-nude dancers are regulated by a separate Rockford ordinance that deals with "Sexually Oriented Businesses." It is undisputed that the business RVS planned to operate could fall within the Exotic Dancing Nightclub definition but not the Sexually Oriented Business definition. Under the Ordinance, an Exotic Dancing Nightclub is defined as:

> A business establishment at which one or more exotic dancers perform or provide entertainment to a patron or patrons. Exotic dancer means any person, whether compensated or not, who dances, performs, or enter-

tains by doing a "striptease" or performs an erotic dance or other movements which include the performer touching their breasts or pubic area, or performing any movements simulating sexual activity while wearing fully opaque clothing covering over primarily the genitalia, pubic region, buttocks and if the person is female, the portions of the breast below the top of the areola.

The Ordinance provides that Exotic Dancing Nightclubs are prevented from operating within 1000 feet "of a church, school, residential district or another exotic dancing nightclub." The Auburn Street property is positioned within 1000 feet of a residential area. Furthermore, even in those areas that are not within 1000 feet of the designated locations, an Exotic Dancing Nightclub must obtain a special use permit specifically allowing its operation at the location it has selected.[1]

In August 2002, the Ordinance was first proposed at a meeting of the Rockford City Council. Alderman ("Ald.") Douglas Mark suggested the adoption of a resolution

---

[1] One seeking such a permit must apply to the Zoning Board of Appeals ("ZBA"), which is required to hold at least one public hearing on the application. ROCKFORD, ILL., ZONING ORDINANCE § 1603.3 (2002). In order to recommend to the City Council the granting of a special use permit, the ZBA must find, among other things, that the establishment of "the special use permit will not be detrimental to or endanger the public health, safety, morals, comfort, or general welfare." Once the hearing is held, the ZBA must transmit its decision to the Zoning Administrator who then transmits the ZBA's recommendation to the City Council. If the ZBA recommends the issuance of a special use permit, a majority of the City Council is required to approve the permit. If the ZBA has recommended denial of the permit, a super-majority (10 of 14 members) of the City Council is required for approval. ROCKFORD, ILL., ZONING ORDINANCE § 1603.6 (2002).

amending Rockford's Zoning Ordinance to add business establishments featuring exotic dancers to the existing land uses that require a special use permit. The matter was referred to the Council's codes and regulations committee. On September 30, 2002, the City Council adopted the codes and regulations committee's report recommending that Rockford file text amendments to the Zoning Ordinance regarding Exotic Dancing Nightclubs. Accordingly, the text amendments were filed with Rockford's zoning officer and a hearing was held on the proposed text amendments by the Zoning Board of Appeals ("ZBA"). On November 19, 2002, after hearing testimony on the matter from City Attorney Kathleen Elliott and Ald. Mark, the ZBA recommended approval of the text amendments. On November 27, 2002, the codes and regulations committee of the City Council voted to recommend sustaining the ZBA's decision to approve the text amendments. On December 9, 2002, the City Council approved the Ordinance.

In considering whether to pass the Ordinance, it is undisputed that the City Council did not rely on any studies from other towns or conduct any of their own studies regarding the relationship between Exotic Dancing Night-clubs and undesirable "secondary effects," such as decreased property values and higher incidence of crime, public health risks, and illegal sexual activities such as prostitution. The Ordinance does not contain any preamble or legislative findings and the journal of proceedings for the City Council meeting at which it was adopted does not state any findings. In fact, the legislative record reflects that the only evidence to support the Ordinance was the testimony offered by City Attorney Elliot and Ald. Mark at the November 19, 2002 ZBA meeting. The minutes from that meeting contain the following passage:

> It is the City's experience that [Exotic Dancing Night-clubs] in a concentrated area or near residential uses

attract[ ] prostitution and other problems that are part of this atmosphere. Alderman Mark stated there have been incidents where liquor sales were procured with the intent of establishing dancing clubs. The proposed text amendments would allow the City more control over the location of these type of clubs to prevent adverse effects on adjoining neighborhoods.

Additionally, the minutes of the Council's codes and regulations meeting for November 27, 2002 contain the following statement: "Although they are not considered sexually oriented business[sic], strip clubs have similar secondary effects in the neighborhood as sexually oriented businesses."

B. Trial

In response to the action filed by RVS against Rockford, the district court denied RVS's request for a temporary restraining order and subsequently conducted a bench trial combining the preliminary and permanent injunction hearings. At trial, Ald. Mark testified that he drafted the Ordinance with the intent of creating three different categories of behavior that would fall within the definition of "exotic dancing." According to Ald. Mark, fully clothed individuals are considered "exotic dancers" if they (1) dance, perform, or entertain by doing a striptease, or (2) perform an erotic dance or other movements which include touching their breasts or pubic area. Under the third category, Ald. Mark testified, individuals are "exotic dancers" if they perform any movements simulating sexual activity while wearing the specified limited clothing. Wayne Dust, Rockford's zoning manager, testified after Ald. Mark. He disagreed with Ald. Mark's interpretation of the Ordinance. Dust testified that he understands the clothing limitation to modify all three categories of conduct.

Rockford also introduced evidence to attempt to show that adverse secondary effects result from the operation of

Exotic Dancing Nightclubs. Rockford police officer David Dominguez, who performs crime analysis for the police department, presented reports summarizing calls relating to prostitution for the years 2001 and 2002. The summaries showed that many calls originated from an area of Rockford known as 7th Street and Broadway.[2] Ald. Jeffrey Holt, whose ward includes the 7th Street and Broadway area, provided testimony pertaining to the conditions of his ward. He testified that the area is comprised of a commercial district in close proximity to a lower-income residential area. The neighborhood contains a community center, a homeless outreach center, a lower-income outpatient clinic, restaurants, furniture stores, rental properties, and adult establishments, including massage parlors, lingerie modeling shops, and dancing clubs. Ald. Holt testified that he received complaints from residents concerning sexually oriented businesses located in the area, relating to their advertising and signage, hours of operation, and density. In Ald. Holt's opinion, the presence of sexually oriented businesses in the 7th Street and Broadway area contributes to lower property values, deteriorated properties, difficulty in attracting development, and prostitution.

Ald. Nancy Johnson, whose ward is adjacent to Holt's, testified that she received calls from residents, complaining about noise, traffic, and litter caused by Bigfoot, an Exotic Dancing Nightclub in her ward. In her opinion, sexually oriented businesses create unattractive appearances due to neon lights, gaudy window displays, and unsavory clientele.

To refute the evidence presented by Rockford, RVS presented expert evidence from Dr. Daniel Linz. Linz testified that studies show that no adverse secondary effects are associated with establishments featuring nude or semi-nude dancing. Additionally, Linz found no studies concerning the

---

[2] RVS's Auburn Street location is not in the 7th Street and Broadway area.

secondary effects of establishments where performers wear clothing. RVS also presented testimony from Dr. Judith Hanna, an anthropologist who has conducted studies of dance and dancers. In Hanna's expert opinion, the definitions of "exotic dance" in the Ordinance are insufficient to define conduct in any meaningful way. She explained that it is common in many forms of mainstream dancing to touch parts of the body, including the breasts and pelvic area. It was also her opinion that the Ordinance's clothing definition encompasses a wide range of dance costumes, uniforms, and practice attire.

At the conclusion of the hearing, the district court issued an opinion finding in favor of Rockford, denying the injunction requests and dismissing the entire case with prejudice. The district court found that the Ordinance was not an unconstitutional prior restraint. Furthermore, the court found that the Ordinance was a proper time, place, and manner restriction because Rockford was entitled to rely on its experience that Exotic Dancing Nightclubs cause undesirable secondary effects. The district court also found that the Ordinance was not unconstitutionally vague or overbroad. RVS appeals the district court's decision with respect to its determination that the Ordinance is not a prior restraint and that sufficient evidence exists to uphold the Ordinance on a secondary effects rationale.

## II. Discussion

A. Legal Framework

In *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), the Supreme Court applied a three-step analysis in reviewing the First Amendment validity of a municipal zoning ordinance that regulated adult movie theaters. The *Renton* analysis instructs courts reviewing regulations of adult entertainment establishments to consider: (1) whether the regulation constitutes an invalid total ban or merely a time,

place, and manner regulation, (2) whether the regulation is content-based or content-neutral, and accordingly, whether strict or intermediate scrutiny is to be applied, and (3) if content-neutral, whether the regulation is designed to serve a substantial government interest and allows for reasonable alternative channels of communication.

In upholding a ban on multiple-use adult establishments, the plurality opinion in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), adhered to the *Renton* framework. However, in his concurrence, Justice Kennedy joined the four dissenters, *id.* at 455-56, in eschewing the content-neutral "fiction" of adult entertainment zoning ordinances. *Id.* at 448 ("These ordinances are content based and we should call them so."); *see also G.M. Enterprises v. Town of St. Joseph*, 350 F.3d 631, 637 (7th Cir. 2003) (explaining that the content-based versus content-neutral inquiry is unnecessary). Generally, content based restrictions on speech are analyzed with the strictest scrutiny, but Justice Kennedy explained that content based zoning regulations can be exceptions to that rule. In so concluding, he agreed with the plurality that "the central holding of *Renton* is sound: A zoning restriction that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny." *Alameda Books*, 535 U.S. at 448. Whatever the label, *Renton*'s second step is best conceived as an inquiry into the purpose behind an ordinance rather than an evaluation of an ordinance's form. *See Alameda Books*, 535 U.S. at 440-41 (plurality opinion) (explaining *Renton*'s second step "requires courts to verify that the *predominant concerns motivating* the ordinance were with the secondary effects of adult [speech]") (emphasis added) (internal quotations omitted); *Ben's Bar v. Village of Somerset*, 316 F.3d 702, 723 (7th Cir. 2003) ("regulations of adult entertainment receive intermediate scrutiny if they are *designed* not to suppress the

"content" of erotic expression, but rather to address the negative secondary effects caused by such expression") (emphasis added); *G.M. Enterprises*, 350 F.3d at 637-38 (noting that courts "must first determine whether the ordinances at issue are *motivated* by an interest in reducing the secondary effects associated with the speech, rather than an interest in reducing speech itself," before applying intermediate scrutiny) (emphasis added).[3] As we noted in *Ben's Bar*, "while the label has changed, the substance of *Renton*'s second step remains the same." 316 F.3d at 702, 721 n.26.

Accordingly, only after confirming that a zoning ordinance's purpose is to combat the secondary effects of speech do we employ *Renton*'s intermediate scrutiny test. Under this test, zoning regulations are constitutional "so long as they are designed to serve a substantial government interest and do not unreasonably limit alternative avenues of communication." *Renton*, 475 U.S. at 47; *see also Alameda Books*, 535 U.S. at 434. At this stage, courts are "required to ask 'whether the municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance.'" *Ben's Bar*, 316 F.3d at 724 (quoting *Alameda Books*, 535 U.S. at 441). In other words, simply stating that

---

[3] Justice Kennedy does not discuss the "predominant concerns" inquiry in his *Alameda Books* concurrence. As he notes that "zoning regulations . . . have a prima facie legitimate purpose: to limit the negative externalities of land use," 535 U.S. at 449, it is possible that he believes this inquiry to be unnecessary, as long as an ordinance may be characterized as a zoning regulation. However, as Justice Kennedy does not explicitly repudiate the "predominant concerns" inquiry and our cases subsequent to *Alameda Books* have continued to employ it, we will include it in our analysis.

an ordinance is designed to combat secondary effects is insufficient to survive intermediate scrutiny. The governmental interest of regulating secondary effects may only be upheld as substantial if a connection can be made between the negative effects and the regulated speech. In evaluating the sufficiency of this connection, courts must "examine evidence concerning regulated speech and secondary effects." *Alameda Books*,535 U.S. at 441. According to the *Alameda Books* plurality, the evidentiary requirement is met if the evidence upon which the municipality enacted the regulation "is reasonably believed to be relevant for demonstrating a connection between [secondary effects producing] speech and a substantial, independent government interest." 535 U.S. at 438 (internal quotations omitted).

However, Justice Kennedy clarified that simply evaluating the strength of the connection is insufficient to pass intermediate scrutiny. It is essential, he explained, to consider the impact or effect that the ordinance will have on speech. That is, not only must the regulation have the "purpose and effect of suppressing secondary effects," it must also leave the "quantity and accessibility of speech substantially intact." *Alameda Books*, 535 U.S. at 450 (Kennedy, J., concurring). This approach requires that two questions be asked and answered to resolve whether a content-based zoning ordinance is justified: (1) "what proposition does a city need to advance in order to sustain a secondary-effects ordinance?"; and (2) "how much evidence is required to support the proposition?" *Id.*; *see also Ben's Bar*, 316 F.3d at 724. As Justice Kennedy explained, "the necessary rationale for applying intermediate scrutiny is the promise that zoning ordinances . . . may reduce the costs of secondary effects without substantially reducing speech." *Alameda Books*, 535 U.S. at 450 (Kennedy, J., concurring). Accordingly, only once a "cost effective"

rationale has been identified to justify a regulation can the sufficiency of the evidence supporting that rationale be evaluated.[4]

In sum, *Alameda*'s plurality opinion along with Justice Kennedy's concurrence establish that in order to justify a content-based time, place, and manner restriction, a municipality must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, (i.e., is designed to serve or furthers a substantial or important government interest), while leaving the quantity and accessibility of speech substantially intact (i.e., the regulation is narrowly tailored and does not unreasonably limit alternative avenues of communication). *Ben's Bar*, 316 F.3d at 725.

B. Application of *Renton/Alameda Books* to the Ordinance

    1.   Strict or Intermediate Scrutiny: Complete Ban or Time Place and Manner Regulation?

First, we note that the Ordinance is not a complete ban on Exotic Dancing Nightclubs, but a zoning regulation, which *Renton* and *Alameda Books* instruct us to consider as a time, place, and manner regulation. Rather than acting as an outright prohibition on "exotic dancing," the Ordinance regulates the locations where that activity may occur. However, the special use permit scheme does create the potential of substantially restricting, or even preventing,

---

[4] The *Alameda Books* plurality characterized Justice Kennedy's concurrence as "a reformulation of the requirement that an ordinance warrants intermediate scrutiny only if it is a time, place, and manner regulation and not a ban." 535 U.S. at 443. It appears to us that Justice Kennedy's contentions were not so limited. We will follow our Court's practice in cases applying *Alameda Books* and treat Justice Kennedy's concurrence as more demanding of the third step of the *Renton* analysis and not merely a restatement of the first step.

the establishment of new Exotic Dancing Nightclubs. Nevertheless, the record does not support the conclusion that the Ordinance amounts to a total ban on protected activity—especially considering that existing Exotic Dancing Nightclubs are unaffected by the Ordinance.

2. Strict or Intermediate Scrutiny: Were the Secondary Effects of Speech the "Predominant Concerns" Motivating Enactment of the Ordinance?

Next, we must examine whether the Ordinance was designed to suppress the content of erotic expression or to address the negative secondary effects caused by such expression. *Ben's Bar*, 316 F.3d at 723. In other words, we must determine whether the "predominant concerns" motivating Rockford's enactment of the Ordinance "were the secondary effects of adult [speech], and not . . . the content of adult [speech]." *Id.*[5] Rockford claims to have enacted the Ordinance to combat the negative secondary effects allegedly created by Exotic Dancing Nightclubs, including prostitution, crime, and decreased property values. To support this claim, Rockford points to testimony from Ald. Mark and City Attorney Elliott given at the ZBA meeting explaining that the purpose of the Ordinance was to ameliorate the negative secondary effects of Exotic Dancing Nightclubs. In addition, Ald. Holt and Ald. Johnson offered testimony at trial relating to the negative effects produced by adult-oriented businesses.

---

[5] "Federal courts evaluating the 'predominant concerns' behind the enactment of a statute, ordinance, regulation, or the like, may do so by examining a wide variety of materials including, but not limited to, the text of the regulation or ordinance, any preamble or express legislative findings associated with it, and studies and information of which legislators were clearly aware." *Ben's Bar*, 316 F.3d at 723, n.28 (citing *Ranch House Inc. v. Amerson*, 238 F.3d 1273, 1280 (7th Cir. 2001)).

However, observations made by Ald. Mark during trial somewhat complicate this inquiry. In response to questions relating to the purpose of the Ordinance, Ald. Mark stated that while Rockford had experienced no problems with the Exotic Dancing Nightclubs currently in operation, "there were some concerns that some people just don't like this type of entertainment." Combating the adverse secondary effects caused by sexually explicit speech is a permissible purpose for a regulation; open and explicit hostility toward and disapproval of the speech itself is not. Certainly, such a direct acknowledgment from the official responsible for introducing the Ordinance makes us sensitive to the possibility that the Ordinance might be a pretextual use of the power to zone as a means of suppressing expression. *See Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 84 (1976) (Powell, J., concurring). Nonetheless, what motivates one legislator to support a statute is not necessarily what motivates others to enact it. *See Renton*, 475 U.S. at 48 (citing *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968)); *see also DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 828-29 (7th Cir. 1999) (rejecting an argument that legislators' improper motive can invalidate an otherwise constitutional ordinance). Accordingly, on balance, it seems that the predominant concerns motivating enactment of the Ordinance related to combating prostitution, crime, and other negative externalities.

   3. Intermediate Scrutiny: Substantial Government Interest, Narrowly Tailored, and Reasonable Alternate Channels of Communication

Even accepting that the "predominant concerns" motivating Rockford's adoption of the Ordinance were the alleged secondary effects caused by Exotic Dancing Nightclubs, we are compelled to reverse the decision of the district court because the Ordinance cannot survive *Renton/Alameda Books* intermediate scrutiny (i.e., designed to serve a substantial government interest, narrowly tailored and does

not unreasonably limit alternate avenues of communica-
tion). *See Ben's Bar*, 316 F.3d at 724.

a.  Substantial Government Interest

As previously noted, our inquiry requires us to answer
two questions: (1) "what proposition does a city need to ad-
vance in order to sustain a secondary-effects ordinance?";
and (2) "how much evidence is required to support the
proposition?" *Alameda Books*, 535 U.S. at 449 (Kennedy, J.,
concurring). Justice Kennedy put forth a proportionality
principle to guide courts in answering the first question. He
explained that, "a city may not assert that it will reduce
secondary effects by reducing speech in the same propor-
tion." *Id*. Following this guideline, Justice Kennedy con-
cluded that the rationale of a dispersal statute must be that
the targeted businesses will disperse rather than shut
down. *Id*. at 451.

Accordingly, Rockford's premise in support of the Ordi-
nance must be that locating Exotic Dancing Nightclubs
away from churches, schools, and residential neighbor-
hoods, and separating Exotic Dancing Nightclubs from one
another will significantly reduce negative secondary effects
that occur when there is a concentration of adult uses in an
area without substantially diminishing the availability of
speech.

As we move to the second question, we are confronted
with a critical deficiency of the Ordinance—the lack of
evidence to support this premise. The record is devoid of
evidence connecting Exotic Dancing Nightclubs and the
secondary effects that allegedly motivated the Ordinance's
adoption. While it seems apparent that the Ordinance will
have the effect of reducing the availability of speech, evi-
dence is lacking to support the proposition that secondary
effects will be reduced by the same degree, if at all.

The Supreme Court has consistently held, "a city must
have latitude to experiment, at least at the outset, and . . .

very little evidence is required [to support an ordinance's proposition]." *Id.* As previously noted, "a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest." *Alameda Books*, 535 U.S. at 438 (plurality opinion) (quoting *Renton*, 475 U.S. at 51-52). However, Rockford has produced little evidence of harmful secondary effects connected to Exotic Dancing Nightclubs beyond the assumption that such effects exist. While it is true that common experience may be relied upon to bolster a claim that a regulation serves a current governmental interest, the experience in this case falls short of satisfying the minimal evidentiary showing required by *Alameda Books*. Indeed, while courts may credit a municipality's experience, such consideration cannot amount to an acceptance of an "if they say so" standard.

Rockford does not identify any studies, judicial opinions, or experience-based testimony that it considered in adopting the Ordinance. Furthermore, the evidence presented at trial represented only a limited showing, consisting of: evidence of a higher than average incidence of prostitution in the 7th Street and Broadway area, testimony from two local officials that police action had not been effective to curb prostitution activity, and testimony from Ald. Johnson that based on her personal observations strip clubs have negative secondary effects on adjoining residential properties.[6]

Even if we were dealing with a typical adult entertainment zoning ordinance, it is questionable whether this modest amount of support would be sufficient under the

---

[6] While the Supreme Court has not definitively addressed the issue, our Court has permitted municipalities to make a record for trial with evidence that it may not have considered when it enacted its ordinance. *See DiMa Corp.*, 185 F.3d at 829-30.

albeit permissive guidelines set by the Supreme Court and this Court's previous cases. While "reasonably believed to be relevant" is not a particularly demanding evidentiary standard, neither the Supreme Court nor this Court has found it satisfied by a similarly limited proffer of evidence. *Compare Alameda Books*, 535 U.S. at 425 (city relied on study it conducted a number of years prior to enacting ordinance); *Renton*, 475 U.S. at 44 (planning committee conducted extensive studies and hearings); *G.M. Enterprises*, 350 F.3d at 631 (town board collected 16 studies and consulted judicial opinions and police reports); *Ben's Bar*, 316 F.3d at 725 (village board relied on numerous judicial decisions, studies from 11 different cities, and findings in a report from the state's attorney general); *Schultz v. City of Cumberland*, 228 F.3d 831 (7th Cir. 2000) (city collected and reviewed studies and conducted legislative research); *DiMA Corp.*, 185 F.3d at 830-31 (town "minimally" met its evidentiary burden by relying on the factual record supporting the experience of another community as reported in a judicial opinion).

We reiterate that "courts should not be in the business of second-guessing fact-bound empirical assessments of city planners." *G.M. Enterprises*, 350 F.3d at 640 (quoting *Alameda Books*, 535 U.S.at 451). However, in a situation like the one before us, where Rockford has not adequately engaged in such an assessment, to conclude that the "reasonably believed to be relevant" requirement has been satisfied would be to permit a municipality to employ an unacceptably low level of justification, as proscribed by the *Alameda Books* plurality. *See* 535 U.S. at 438.

Nonetheless, the requirement that municipalities be allowed a reasonable opportunity to experiment with solutions to an admittedly serious problem might render the offered evidence sufficient if the Ordinance applied only to bars and clubs that present nude or semi-nude dancing. "Such entertainment has a long history of spawning dele-

terious effects, including prostitution and the criminal abuse and exploitation of young women, and in most cases a city or state need only carry a minimal burden to demonstrate its interest in regulation of such activity." *Giovani Carandola, Limited v. Bason*, 303 F.3d 507, 516 (4th Cir. 2002) (internal citations omitted). In contrast, the regulation in this case targets clothed dancers who convey an erotic message through their movements. Within the confines of this record evidence does not exist to support a connection between establishments offering dancing by entertainers who are clothed and adverse secondary effects. While it may have been reasonable for Rockford to believe that the evidence presented at trial was relevant to demonstrate a connection between adverse secondary effects and nude or topless dancing, we conclude that it falls short of being relevant to establishing a meaningful connection between negative secondary effects and the type of entertainment to which the Ordinance applies.

Most of the Rockford's evidence, at least as presented to date, does not appear to be directly relevant to the type of entertainment that Rockford seeks to regulate. At trial, Rockford focused on the problems afflicting the 7th Street and Broadway area. Indeed, Officer Dominguez's incidence reports reflect that many prostitution calls originated from this general vicinity in 2001 and 2002. However, Rockford did not present to the Court any examples of businesses in this area that fall within the definition of the Ordinance. While the members of the City Council indicated in their testimony that such establishments exist, they did not provide any examples. Their general statements alone may have been sufficient were it not for the repeated overlap of terminology at trial. Witnesses and Rockford's attorney continuously used the terms Sexually Oriented Business and Exotic Dancing Nightclub interchangeably. As a result of this lack of distinction, we cannot presume that the bus-

inesses operating in the 7th Street and Broadway area are Exotic Dancing Nightclubs as opposed to Sexually Oriented Businesses.

Notably, Ald. Mark testified that five Exotic Dancing Nightclubs currently exist within Rockford. Indeed, five specific business establishments (The Flag, State Street Station, Hideaway, Surf Lounge, and Bigfoot) were mentioned by various witnesses at trial as examples of Exotic Dancing Nightclubs. However, our search of the public record indicates that none of these businesses are actually located in the 7th Street and Broadway area. Accordingly, it is difficult to conclude that the incidence reports and testimony regarding 7th Street and Broadway reasonably support the premise that a concentration of Exotic Dancing Nightclubs result in adverse secondary effects. In effect, the only evidence we are left with supporting Rockford's rationale behind the Ordinance are the conclusory statements in the ZBA and codes and regulations minutes and the testimony of one local official that in her personal experience Exotic Dancing Nightclubs have a negative impact on the surrounding community. If Rockford had presented more convincing evidence to show that some businesses featuring clothed entertainers produce adverse secondary effects, a different result might ensue.

b. Narrowly Tailored and Reasonable Alternate Channels of Communication

Additionally, the Ordinance does not appear to be narrowly tailored to affect a category of business establishments shown to produce unwanted secondary effects—or even establishments that could conceivably produce them. *See Ben's Bar*, 316 F.3d at 725 (explaining that a regulation must leave the quantity and accessibility of speech substantially intact). Under a narrow reading, the Ordinance regulates all persons performing an erotic dance (or other specified movements) at a business establishment while

wearing more or less the equivalent of short shorts and, if female, an opaque bra.[7] While understandably aimed at entertainers of a more "adult" persuasion, there exists the potential that mainstream performances could fall under the purview of the Ordinance. Simply, Rockford has not presented justification why it is essential to regulate such a wide universe of dance. *Cf. Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988 (7th Cir. 2002) (holding that an ordinance prohibiting a sexually oriented business' signage from displaying anything other than the business name was not narrowly tailored to reduce secondary effects where municipality could not articulate a single reason why such a rule was necessary).

Certainly, as a direct restriction on erotic expression, speech fares worse under the Ordinance than it did under the laws at issue in similar cases. In *Ben's Bar*, the ordinance did not restrict erotic expression, but rather prohibited sexually oriented businesses from serving alcohol during a dancer's performance. 316 F.3d at 726. Similarly, in *G.M. Enterprises*, the availability of speech was left substantially intact because the ordinances merely sought to minimize the factors that "heighten[ed] the probability that adverse secondary effects would result from nude dancing: physical proximity between the dancers and patrons, and the consumption of alcohol by patrons." 350 F.3d at 638. Under the regulation at issue in *G.M.*, if dancers chose to wear *de minimus* clothing the ordinance's restrictions could

---

[7] This interpretation is similar to the one advanced by Wayne Dust, Rockford's zoning manager, at trial (i.e., the clothing clause is read to modify all three categories of conduct). While we believe Ald. Mark's interpretation (i.e., the clothing clause applies only to the last category) is the more structurally natural reading; the outcome produces an irrational result that we will not employ. We will treat the clothing clause as modifying all three categories of conduct.

be avoided entirely. *Id.*; *see also Alameda Books*, 535 U.S. at 447 (Kennedy, J., concurring) (noting that the ordinance extended to non-expressive activities, like massage parlors); *DiMa Corp.*, 185 F.3d at 823 (ordinance regulated bookstore's hours of operation).

In contrast, the Ordinance here is focused on expressive conduct. Rather than targeting a non-expressive aspect of Exotic Dancing Nightclubs, like neon signs, the Ordinance targets the speech itself. As a zoning regulation we view the Ordinance as less restrictive than an outright ban; however, it is still the case that to avoid the Ordinance dancers must not convey an erotic message through their movements (or they must wear significantly more clothing than the amount we have considered to be *de minimus* in past cases). Like the regulation this Court struck down in *Schultz v. City of Cumberland*, the Ordinance "deprives the performer of a repertoire of expressive elements with which to craft an erotic, sensual performance and thereby interferes substantially with the dancer's ability to communicate an erotic message." 228 F.3d 831, 847 (7th Cir. 2000) (invalidating regulation that banned the performance of specified sexually explicit movements within sexually oriented businesses finding that "[b]y restricting particular erotic movements and gestures of the erotic dancer . . . [the regulation] unconstitutionally burdens protected expression.").

As we have determined that the Ordinance is not appropriately designed to serve a substantial government interest and is not narrowly tailored, it is unnecessary for us to separately analyze whether the Ordinance leaves open reasonable alternate channels of communication.

C. Applying *Renton/Alameda Books* Beyond Sexually Explicit Speech

As a final matter, we observe that challenging questions are raised by the Ordinance's expansiveness. While we applied the *Renton/Alameda Books* framework in reviewing

the constitutionality of the Ordinance, it is unclear how "sexual" in nature regulated speech must be to warrant the *Renton*/*Alameda Books* analysis. Even under our narrow reading of "exotic dancing," a number of expressive activities may fall within Rockford's definition that are not ordinarily regulated under a secondary effects theory. It is important to keep in mind that the Ordinance does not apply to nude dancing or other forms of nude entertainment. A survey of the laws challenged on secondary effects grounds in leading Supreme Court and Seventh Circuit cases illustrates the unusual breadth of the Ordinance. *See Alameda Books*, 535 U.S. at 425 (prohibiting "Adult Entertainment Businesses"[8] from operating in the same building); *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000) (restricting public nudity); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) (same); *Renton*, 475 U.S. at 41 (regulating the location of adult motion picture theaters); *G.M. Enterprises*, 350 F.3d at 631 (regulating nude dancing); *Ben's Bar*, 316 F.3d at 702 (prohibiting the sale, use, and consumption of alcohol on the premises of "Sexually Oriented Businesses"[9]).

As these cases demonstrate, courts have upheld a number of restrictions on sexually explicit expression that falls

---

[8]  The city defined "Adult Entertainment Business" as an "adult arcade, bookstore, cabaret, motel, theater, or massage parlor or a place for sexual encounters." 535 U.S. at 431.

[9]  The ordinance at issue in *Ben's Bar* defined "Sexually Oriented Business" as "an adult arcade, adult bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, escort agency or sexual encounter center." 316 F.3d at 708, n.8. As it regularly featured nude and semi-nude persons, Ben's Bar fell under the sub-category of "adult cabaret." *Id.* at 708. The ordinance further defined semi-nudity as "the exposure of a bare male or female buttocks or the female breast below a horizontal line across the top of the areola at its highest point with less than complete and opaque covering." *Id.*

short of obscenity.[10] However, what constitutes sexually explicit but non-obscene expression can be difficult to define. Previously, regulating nudity or semi-nudity has served as a common link in the laws enacted by municipalities pertaining to sexually explicit expression. The uniqueness of the Ordinance is that it removes nudity from the calculus and seeks to regulate clothed individuals. The challenge attendant to this legislative leap may be that it cuts a broader swath across expression and attempts to apply the "secondary effects" reasoning of *Renton* to laws not confined to regulating "sexually explicit" speech. Recently, the Eighth Circuit noted that First Amendment issues may be raised by classifying live entertainment by clothed dancers as sexual expression. *Jake's, Ltd., Inc. v. City of Coates*, 356 F3d 896, 903 (8th Cir. 2004). Indeed, it remains questionable how and if the *Renton/Alameda Books* analysis would apply in a case with even more tangential of a relationship to businesses purveying sexually explicit materials and entertainment. *See Boos v. Barry*, 485 U.S. 312, 334-35 (1988) (Brennan, J., concurring) (objecting to implication that content-based regulations could ever be subject to "secondary effects" analysis outside the area of sexually explicit speech).

### III.  Conclusion

We do not conclude that Rockford may not permissibly use its zoning power to regulate any type of clothed danc-

---

[10] Obscenity is a constitutionally unprotected category of speech. *See Miller v. California*, 413 U.S. 15 (1973) (holding that governments may regulate speech as obscene if it (a) under community standards, appeals to the prurient interest, (b) taken as a whole, is a patently offensive depiction or description of sexual conduct, and (c) lacks serious literary, artistic, political, or scientific value).

ing. As we have previously noted of other zoning ordinances regulating dancing: "the expressive activity involved in the kind of striptease entertainment provided in a bar has at best a modest social value and is anyway not suppressed but merely shoved off to another part of town, where it remains easily accessible to anyone who wants to patronize that kind of establishment." *Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1124 (7th Cir. 2002) (upholding denial of liquor license to club whose dancers performed in pasties and bikini bottoms). It is arguable that at least some forms of clothed entertainment may initiate adverse secondary effects similar to the ones caused by establishments featuring nude and semi-nude entertainment. However, a municipality must offer sufficient evidence in support of this proposition. Without further direction from the Supreme Court, we cannot constitutionally lower the already modest evidentiary hurdle for justifying regulations of sexually explicit but non-obscene speech on secondary effects grounds, especially in a case where mainstream speech is affected.

For the foregoing reasons, the Ordinance as presently drafted violates the First Amendment. As this determination is sufficient to permanently enjoin enforcement of the Ordinance, we offer no opinion regarding RVS's prior restraint arguments. We REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*