*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0052p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RICHLAND BOOKMART, INC. d/b/a TOWN AND
COUNTRY BOOKSTORE; KNOXVILLE ADULT
VIDEO SUPERSTORE, INC.; and GREG TURNER,
d/b/a RAYMOND'S PLACE,

> *Plaintiffs-Appellants/*
> *Cross-Appellees,*

v.

KNOX COUNTY, TENNESSEE,

> *Defendant-Appellee/*
> *Cross-Appellant.*

Nos. 07-6469; 08-5036

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 05-00229—Thomas W. Phillips, District Judge.

Argued: December 11, 2008

Decided and Filed: February 12, 2009

Before: BOGGS, Chief Judge; KETHLEDGE, Circuit Judge; and THAPAR, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Frierson M. Graves, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, Memphis, Tennessee, for Appellants. Scott D. Bergthold, LAW OFFICE OF SCOTT D. BERGTHOLD, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** Frierson M. Graves, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, Memphis, Tennessee, Michael F. Pleasants, Sr., PLEASANTS LAW FIRM, Memphis, Tennessee, Joseph J. Levitt, Jr., Knoxville, Tennessee, for Appellants. Scott D. Bergthold, Bryan Allen Dykes, LAW OFFICE OF SCOTT D. BERGTHOLD, Chattanooga, Tennessee, for Appellee.

---

[*]The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

————————————

**OPINION**

————————————

BOGGS, Chief Judge.  Three sexually oriented businesses,  Richland Bookmart, Inc., Adult Video Superstore, Inc., and Raymond's Place filed suit to challenge the constitutionality of a Knox County Ordinance that establishes licensing requirements and regulations for sexually-oriented businesses.  Plaintiffs attacked several provisions of the Ordinance, on the theory that the Ordinance is unconstitutional as applied to them and on its face.  Upon motions by both parties, the district court granted summary judgment in favor of Knox County and denied Plaintiffs' motion for partial summary judgment, with one small exception: the court ordered the severance of two crimes, "racketeering" and "dealing in controlled substances," from the list of crimes that triggered the Ordinance's civil disability provision.  Plaintiffs' appeal raises four main issues. First, Plaintiffs claim that the Ordinance is an unconstitutional infringement on First Amendment freedoms that is not justified by adequate evidence that local sexually oriented businesses produce adverse "secondary effects" or that the Ordinance is designed to remedy such effects.   Second, Plaintiffs claim that the definitions of "nudity," "semi-nudity," and "adult motel," as well as the prohibition on the sale and consumption of alcohol are not narrowly tailored and are unconstitutionally overbroad. Third, they claim that the Ordinance enacts an unconstitutional prior restraint.  Fourth, they claim that the Ordinance's regulation of business hours is preempted by Tennessee law. Knox County cross-appeals, arguing that the district court erroneously ordered the severance of "racketeering" and "dealing in controlled substances" from the Ordinance's civil disability provision.  With regard to the issues presented by Plaintiffs' appeal, we affirm the district court's decision; with regard to the cross-appeal, we reverse the order to sever.

**I**

Richland Bookmart, Inc. ("Richland") and Adult Video Superstore, Inc. ("Adult Video") are adult stores that sell and rent books, magazines and videos to adults. Both Richland and Adult Video are "off-site consumption" or "retail only" businesses – they do not operate on-site facilities for viewing of films or for other adult entertainment. Richland has operated for over twenty years; Adult Video opened in 2004. Greg Turner operates Raymond's Place ("Raymond's"), an adult cabaret that provides "adult entertainment to consenting adults," including female dancers performing in the nude or clad in pasties and g-strings.

In the fall of 2004, the Knox County Commission ("County") began to update its regulation of sexually oriented businesses, culminating in Ordinance O-05-2-102 ("Ordinance"). The Ordinance enacted licensing requirements and other regulations applicable to "sexually oriented businesses," which include adult arcades, adult bookstores or adult video stores, adult cabarets, adult motels, adult motion picture theaters, semi-nude model studios, sexual device shops, and sexual encounter centers.

An "adult bookstore or adult video store" is defined as "a commercial establishment which, as one of its principal business purposes, offers for sale or rental for any form of consideration any one or more of the following: books or [visual representations] which are characterized by their emphasis upon the display of 'specified sexual activities' or 'specified anatomical areas'." In reaction to a June 29, 2005 decision by the Tennessee Supreme Court, which invalidated a zoning ordinance on the basis of its vague definition of "adult bookstore," *see City of Knoxville v. Entertainment Resources, LLC*, 166 S.W.3d 650 (Tenn. 2005), the County amended its definition of adult bookstore or video store. The amended Ordinance specifies that a "principal business purpose" is defined to mean 35% or more of any one of the following: (a) displayed merchandise, (b) wholesale or (c) retail value of the displayed merchandise, (d) revenues derived from sale or rental, or (e) interior business space (we shall refer to this provision as the "35% threshold"). In addition, (f) a business that

"regularly features" the "specified sexual activities" or "anatomical areas" and "prohibits access by minors, because of age, to the premises, and advertises itself as offering 'adult' or 'xxx' or 'x-rated' or 'erotic' or 'sexual' or 'pornographic' material on signage visible from a public right of way," is also defined to have the principal business purpose sufficient to bring it within the scope of the Ordinance.

An adult cabaret is defined as "a nightclub, bar, juice bar, restaurant, bottle club, or similar commercial establishment, whether or not alcoholic beverages are served, which regularly features persons who appear semi-nude."  "Semi-nude or state of semi-nudity" is further defined to mean "the showing of the female breast below a horizontal line across the top of the areola and extending across the width of the breast at that point, or the showing of the male or female buttocks.  This definition shall include the lower portion of the human female breast, but shall not include any portion of the cleavage of the human female breasts exhibited by a bikini, dress, blouse, shirt, leotard, or similar wearing apparel provided the areola is not exposed in whole or in part."[1]

The Ordinance regulates sexually oriented businesses in three general ways: it requires that such businesses and all employees thereof be licensed on an annual basis, Secs. 4-12; it regulates business hours, the manner in which sexually explicit films or videos may be exhibited, and interior configuration requirements, Secs. 13-15; and it prohibits certain activities, Sec. 18.  With regard to licensing, the Ordinance provides that a license "shall" be issued to both businesses and employees unless one of the specified conditions is met.  One such condition is the applicant's conviction, a plea of guilty or of nolo contendere to a "specified criminal activity," namely "rape, aggravated rape, aggravated sexual assault, public indecency, statutory rape, rape of a child, sexual exploitation of a minor, indecent exposure," "dealing in controlled substances," or "racketeering."  Sec. 5(a)(6), (b)(5).  A business can also lose its license if it knowingly hires someone who committed one of these specified crimes within the previous five years.  Sec. 10.

---

[1]The word "bikini" was added into the definition at the same time as the definition of "adult bookstore or adult video store" was amended.

The Ordinance prohibits nudity and the "sale, use or consumption" of alcoholic beverage on the premises of a sexually oriented business. "Nudity or a state of nudity" is defined to mean "the showing of the human male or female genitals, pubic area, vulva, anus, anal cleft or cleavage with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any part of the nipple and areola."

In May 2005, Richland and Adult Video filed suit seeking a preliminary injunction, a permanent injunction, and declaratory judgment against the Ordinance. After the Ordinance was amended as noted above and Raymond's motion to intervene was granted, the court denied the County's motion to dismiss. Plaintiffs moved for partial summary judgment, arguing that four provisions of the Ordinance are overbroad and not narrowly tailored, and the County moved for summary judgment in November 2007. On December 17, 2007, the district court denied Plaintiffs' motion and granted the County's motion for summary judgment with one exception: the court ordered that "racketeering" and "dealing in controlled substances" be severed from the Ordinance's definition of "specified criminal activity."

**II**

We review a district court's grant of summary judgment de novo. *Trustees of the Mich. Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 590 (6th Cir. 2000). The decision below may be affirmed only if the pleadings, affidavits, and other submissions show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, we draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

**III**

Plaintiffs' first argument attacks the relevance and sufficiency of the evidence relied on by the County to justify the regulation of adult stores selling for off-site consumption only and of stores barely meeting the 35% threshold. Furthermore, Plaintiffs claim to have produced their own evidence that puts the County's factual findings and rationale in sufficient doubt to render summary judgment for the County inappropriate. In order to evaluate the merits of Plaintiffs' first claim, we must first determine how much and what kind of evidence is required to justify a regulation such as the present Ordinance, and how much and what kind of evidence is required to mount a successful challenge thereto.

**A**

A regulation of sexually oriented businesses, such as the Knox County Ordinance, implicates at least two protected categories of speech: first, sexually explicit but non-obscene speech, such as adult publications and adult videos, and second, "symbolic speech" or "expressive conduct," such as nude dancing. The Supreme Court has held that a restriction on protected speech is "sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). Similarly, "time, place, and manner" regulations of protected speech will survive constitutional scrutiny "so long as they are [content neutral,] designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *City of Renton v. Playtime Theatres*, 475 U.S. 41, 47 (1986).

The Supreme Court has indicated that "the [*O'Brien*] standard for judging the validity of restrictions on expressive conduct . . . in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions." *Ward v. Rock*

*Against Racism*, 491 U.S. 781, 797-98 (1989) (internal quotation marks and citation omitted); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) ("In *Clark* [*v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984),] we observed that this [time, place, or manner] test has been interpreted to embody much the same standards as those set forth in *United States v. O'Brien* . . . ."). Accordingly, we have previously treated the two standards as sufficiently similar to be applied interchangeably. *See, e.g., Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 299 n.6 (6th Cir. 2008); *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 410 n.6 (6th Cir. 1997). Yet, the two formulations were penned in different contexts and employ different language; neither the Supreme Court nor this court has made explicit whether and when the differences have any legal significance. We continue to adhere to the position that the *O'Brien* and *Renton* inquiries "embody much the same standards," *Barnes*, 501 U.S. at 566. *DLS, Inc.*, 107 F.3d at 410 n.6. At the same time, a clear resolution of Plaintiffs' first claim is aided by an understanding of the difference between *O'Brien* and its progeny and *Renton* and its progeny.

Unlike content-based regulations that are subject to the "most exacting scrutiny," regulations "unrelated to the content of speech are subject to an intermediate level of scrutiny." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994). In *O'Brien*, the Supreme Court set out the intermediate scrutiny standard for the constitutionality of content-neutral regulations of expression and applied it to a regulation of general conduct (a prohibition on the destruction of Selective Service draft cards) that incidentally burdened "symbolic speech" or "expressive conduct" (the burning of a draft card to protest the war). 391 U.S. at 376-77. In *Renton*, the Supreme Court confronted another kind of content-neutral law: a time, place, or manner regulation aimed at negative "secondary effects" of protected speech.[2]

---

[2]We have acknowledged that, to some extent, the classification of restrictions on sexually explicit establishments as content-neutral is a legal fiction – but one that has been generally followed. *Richland Bookmart v. Nichols*, 137 F.3d 435, 440 (6th Cir. 1998). As we have noted, "[a]lthough five members of the Court abandoned the premise that such restrictions are content-neutral sixteen years later in *City of Los Angeles v. Alameda Books*, [535 U.S. 425 (2002)] the Court continued to apply intermediate scrutiny to laws targeting 'secondary effects.'" *729, Inc. v. Kenton County Fiscal Court*, 515 F.3d 485, 490-91 (6th Cir. 2008).

In *Renton*, the Supreme Court reformulated the requirements of the *O'Brien* test and made them more specific as applied to the subset of content-neutral regulations then before the Court. *Renton*'s standard applies to time, place, and manner regulations rather than to prohibitions of speech, thereby limiting its application to laws that satisfy *O'Brien's* first requirement that regulations be within the government's constitutional power. *Renton* closely mirrors *O'Brien*'s second requirement that the regulation "further" a substantial government interest by requiring that it be "designed to serve" the same. *Renton* requires that such regulations be content-neutral, thereby satisfying *O'Brien*'s third requirement that the interest be unrelated to the suppression of speech.

*O'Brien*'s final demand that a restriction be "no greater than is essential to the furtherance" of the government interest is a requirement that the law be narrowly tailored. *See Turner Broad. Sys.*, 512 U.S. at 662 (stating that a law needs to be narrowly tailored to satisfy the *O'Brien* standard, and that narrow tailoring "in this context requires . . . that the means chosen do not burden substantially more speech than is necessary to further the government's legitimate interests." (internal quotation marks and citation omitted)). While *Renton* does not explicitly require narrow tailoring, we agree with the Seventh Circuit that a narrow-tailoring requirement is implicit in the *Renton* standard. *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 714 n.16 (7th Cir. 2003). That circuit noted that "the Supreme Court does not always spell out the 'narrowly tailored' step as part of its standard for evaluating time, place, and manner restrictions." *Ibid*. However, "a close examination of *Renton* reveals that the Court did consider whether the zoning ordinance at issue was narrowly tailored," *ibid*. (citing *Renton*, 475 U.S. at 52), and that the Court has required narrow tailoring in other cases involving time, place, and manner regulation. *See Ward*, 491 U.S. at 791 (holding that to pass constitutional scrutiny, time, place, or manner restrictions must be "'justified without reference to the content of the regulated speech, . . . narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information'") (quoting *Clark*, 468 U.S. at 293). *Renton*'s final requirement that alternative avenues of communication are not to be unreasonably

restricted is the only one that finds no reflection in *O'Brien*: it may fairly be said that this additional requirement exists to guard against the peculiar risks of time, place, and manner regulations that are not presented by general-conduct regulations.

The choice between the *O'Brien* and *Renton* doctrines takes on some significance mainly when we must determine what evidence is sufficient to satisfy the substantially equivalent intermediate-scrutiny standards. *See also Peek-a-Boo Lounge of Bradenton, Inc. v. Manatee County*, 337 F.3d 1251, 1264-65 (11th Cir. 2003). Importantly, the kind of evidence required to establish that a regulation furthers a substantial government interest depends on character of the interest. A content-neutral regulation of conduct, such as the prohibition on public nudity or on the destruction of draft cards, "require[s] *no evidentiary showing* at all that the threatened harm was real." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 299 (2000) (emphasis added). It was enough, for example, that Congress took "official notice, as it were, that draft card destruction would jeopardize the [Selective Service] system," and no further evidence or studies were required. *Ibid.* (citing *O'Brien*, 391 U.S. at 378-80). *See also Barnes*, 501 U.S. at 567-68. However, as the Supreme Court cautioned, "[t]he fact that this sort of leeway is appropriate in a case involving *conduct* says nothing whatsoever about its appropriateness in a case involving *actual regulation of First Amendment expression*." *Ibid*. (emphasis added); *see also Schad v. Mount Ephraim*, 452 U.S. 61, 73 (1981) (holding that plaintiffs' convictions for violation of a zoning ordinance prohibiting all live entertainment in the Borough of Mount Ephraim ran afoul of the First and Fourteenth Amendments, because "*the Borough has presented no evidence* . . . that live entertainment poses problems . . . more significant than those associated with various permitted uses" (emphasis added)).

The burden governments must carry to establish the connection between "actual regulation of First Amendment expression" and its purported impact on secondary effects was further elaborated in *Alameda Books*. 535 U.S. 425. The initial evidentiary burden on the government is not a heavy one: the entity issuing the regulation "must have had a reasonable evidentiary basis for concluding that its regulation would have the

desired effect.  Although not extraordinarily high, this evidentiary burden requires that the entity show that the evidence upon which it relied was 'reasonably believed to be relevant to the problem' that the entity sought to address."  *729, Inc.*, 515 F.3d at 491 (citing *Renton,* 475 U.S. at 51-52; *Alameda Books*, 535 U.S. at 438, 439 (plurality); *Id.* at 449 (Kennedy, J., concurring in the judgment)).  No comparable "evidentiary basis" has been demanded to establish that a general-conduct regulation further such an interest.  *See Pap's A.M.*, 529 U.S. at 298-99 ("The Court [in *O'Brien*] did not require evidence that the integrity of the Selective Service System would be jeopardized by the knowing destruction or mutilation of draft cards. . . .  There was no study documenting instances of draft card mutilation or the actual effect of such mutilation on the Government's asserted efficiency interests.").  For this reason, our first step is to determine whether the Knox County Ordinance purports to be a regulation of conduct that incidentally burdens expression (as in *O'Brien*), a time, place, or manner regulation targeting secondary effects (as in *Renton*), or a regulation comprising both (as in *Pap's A.M.*).[3]

The Knox County Ordinance is a content-neutral time, place, and manner regulation.  Its stated aim is to "prevent the deleterious secondary effects of sexually oriented businesses within the County."  Sec. 1(a).  To combat the secondary effects identified in the Preamble to the Ordinance, the County chose to regulate sexually oriented businesses by means of a licensing scheme and other regulations that are applicable to such establishments only, and a prohibition on only certain activities in such establishments.  The County does not attempt to regulate a general category of conduct as in *O'Brien* or *Barnes*; instead, it expressly seeks to regulate protected

---

[3]It is, of course, possible that the government interest comprises both a regulation of general conduct and control of secondary effects:

> While the doctrinal theories behind "incidental burdens" and "secondary effects" are, of course, not identical, there is nothing objectionable about a city passing a general ordinance to ban public nudity (even though such a ban may place incidental burdens on some protected speech) and at the same time recognizing that one specific occurrence of public nudity – nude erotic dancing – is particularly problematic because it produces harmful secondary effects.

*Pap's A.M.*, 529 U.S. at 295; *see also Clark*, 468 U.S. at 294 (agreeing with petitioners' justification of a regulation forbidding sleeping in a park "either as a time, place, or manner restriction or as a regulation of symbolic conduct").

expression in order to ameliorate adverse secondary effects. *Cf. Pap's A.M.*, 529 U.S. at 289-90 (holding that Erie's ordinance is on its face a general prohibition on public nudity that does not target expressive nude dancing). Thus, we find it prudent to conduct our analysis in terms set forth in *Renton* and *Alameda Books* – or, equivalently, to apply the *O'Brien* test, incorporating evidentiary standards articulated in *Renton* and its progeny.[4]

**B**

The next question is whether the Ordinance serves a substantial government interest. It is now recognized that governments have a substantial interest in controlling adverse secondary effects of sexually oriented establishments, which include violent, sexual, and property crimes as well as blight and negative effects on property values. *E.g., Pap's A.M.*, 529 U.S. at 296; *Richland Bookmart*, 137 F.3d at 440. Plaintiffs argue that the Ordinance does not advance that admittedly important interest and that summary judgment in favor of the County was improper because Plaintiffs adduced facts demonstrating that at least a subset of the businesses regulated by the Ordinance has not in fact generated any adverse secondary effects in Knox County. Under *Renton*, the County had to provide "a reasonable evidentiary basis for concluding that its regulation would have the desired effect." *729, Inc. v. Kenton County Fiscal Court*, 515 F.3d 485, 491 (6th Cir. 2008). Plaintiffs submit that the County failed to carry its initial evidentiary burden, "however slight," because the evidence cited in the Ordinance is not "germane" to at least two categories of adult businesses in Knox County – namely, "off-site consumption" bookstores or video stores such as Richland and Adult Video, and "combination" adult-mainstream stores that barely meet the Ordinance's 35% threshold. Appellants' Br. at 22, 26.

The Supreme Court and this court have repeatedly held that local governments need not conduct their own studies demonstrating that adverse secondary effects result

---

[4]This is in accord with our prior decisions, in which we have applied the *O'Brien* test and required that regulations meet the evidentiary burden set forth in *Renton*. *E.g., Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 789, 791 (6th Cir. 2005) (en banc).

from the operation of sexually oriented businesses or that the measures chosen will ameliorate these effects. *Alameda Books*, 535 U.S. at 438 (plurality opinion); *id.* at 451 (Kennedy, J., concurring); *Pap's A.M.*, 529 U.S. at 296; *Renton*, 475 U.S. at 51-52; *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County*, 466 F.3d 391, 398 (6th Cir. 2006); *Deja Vu of Cincinnati, L.L.C. v. Union Twp.*, 411 F.3d 777, 791 (6th Cir. 2005) (en banc). "The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is *reasonably believed to be relevant* to the problem that the city addresses." *Renton*, 475 U.S. at 51-52 (emphasis added). Nor are local governments required to demonstrate empirically that its proposed regulations will or are likely to successfully ameliorate adverse secondary effects. *Alameda Books*, 535 U.S. at 439. Thus, insofar as Plaintiffs merely dispute the relevance of "foreign" and outdated studies, they fail to create a genuine issue of material fact to survive summary judgment.

This is not to say that, provided that the now-standard list of studies and judicial opinions is recited, no plaintiff could ever successfully challenge the evidentiary basis for a secondary-effects regulation. Albeit light, the burden on the government is not non-existent, and a plaintiff may put forth sufficient evidence to further augment that burden:

> This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Alameda Books*, 535 U.S. at 438-39. As we have recently noted, the *Alameda Books* plurality thus "set forth a burden-shifting framework governing the evidentiary standard

in secondary-effects cases." *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 297 n.5 (6th Cir. 2008).[5]

Plaintiffs contend that not only has the County failed to carry its initial burden, but that they have "raised the doubt required by *Alameda*," Appellants' Br. at 31, shifting the burden back to the County to proffer further evidence in support of its rationale, which makes summary judgment for the County at this stage improper. As an initial matter, Plaintiffs are incorrect to suggest that the County cited no findings relevant to the secondary effects of the contested types of businesses (off-site and combination stores). In fact, the Ordinance relied on a number of judicial decisions, which held that evidence of secondary effects produced by off-site or retail-only sexually oriented businesses was sufficient to justify their regulation. For example, in *H & A Land Corp. v. City of Kennedale*, the Fifth Circuit stated that the City of Kennedale "cannot reasonably believe its evidence [of secondary effects] is relevant unless it sufficiently segregates data attributable to off-site establishments from the data attributable to on-site establishments." 480 F.3d 336, 339 (5th Cir. 2007). That Circuit considered the evidence offered by the City and found that a 1984 Indianapolis study and a 1986 Oklahoma City study indeed isolated the effects of off-site establishments on property values, which sufficiently "support[ed] the belief that off-site sexually oriented businesses cause harmful secondary effects." *Ibid.* Similarly, in *World Wide Video of Wash., Inc. v. City of Spokane*, the Ninth Circuit upheld Spokane's regulation of retail-only stores on the basis of testimonial evidence from residents complaining of a variety of negative effects associated with this category of businesses. 368 F.3d 1186, 1197 (9th Cir. 2004). The Indianapolis and Oklahoma studies relied on by Kennendale and the testimonial evidence relied on by Spokane were also included among the findings made by the County in enacting the Ordinance.

---

[5]Because Justice Kennedy concurred in the judgment of the Court on the narrowest grounds, his concurrence represents the Court's holding in *Alameda Books*. *729, Inc.*, 515 F.3d at 491. Justice Kennedy's concurrence seems to endorse the evidentiary standard set forth by the plurality, and departs from the plurality on a different point. *See* 535 U.S. at 451, 453 (Kennedy, J., concurring) (stating that "very little evidence" is required to justify a secondary effects regulation "at least at the outset," but that the regulation may not withstand intermediate scrutiny if the evidentiary "assumptions" are later "proved unsound").

While some courts have presumed that the distinction between off- and on-site consumption may be constitutionally relevant, *H & A Land Corp.,* 480 F.3d at 339, it is difficult to maintain the same about Plaintiffs' suggested distinction between "combination" stores that just barely meet one of the 35% thresholds and those that meet it by some larger margin. Requiring local governments to produce evidence of secondary effects for all categories created by every articulable distinction is a misapprehension of the Supreme Court's holding that governments may rely on any evidence "reasonably believed to be relevant." *Alameda Books*, 535 U.S. at 438-39 (stating that the city need not demonstrate that "adult department stores" produce the same secondary effects as "adult minimalls"); *see also G.M. Enters. v. Town of St. Joseph*, 350 F.3d 631, 639 (7th Cir. 2003) ("The plurality [in *Alameda Books*] did not require that a regulating body rely on research that targeted the exact activity it wished to regulate, so long as the research it relied upon reasonably linked the regulated activity to adverse secondary effects."). While the 35% threshold may be arbitrarily chosen, and it very well may be that this threshold sweeps in some relatively benign establishments, it is not for us to decide that some higher, equally arbitrary percentage would lessen the burden on expression without compromising the efficacy of the Ordinance in controlling secondary effects. *See DLS, Inc.*, 107 F.3d at 413 ("The City Council determined that a six-foot zone struck the appropriate balance; while it is probable that each marginal foot of the buffer zone achieves each of these goals somewhat less efficiently, it is not for us to say that a seven-foot zone or a five-foot zone would strike a better balance."). Thus, we find that the cumulative evidence of secondary effects documented in the preamble to the Ordinance "fairly supports" the County's rationale in regulating off-site and combination establishments, along with other sexually oriented businesses, as required by *Alameda Books*.

Because we find that the County met its initial evidentiary burden, only if Plaintiffs succeed in casting "direct doubt" on the County's rationale or factual findings would the County need additional support for its decision to regulate the contested business categories. We conclude that Plaintiffs' efforts to cast such doubt are

unsuccessful. Assuming for the sake of argument that the evidence offered by the Plaintiffs is not inadmissible on summary judgment, as the County argues it is, Appellee's Br. at 36-38, it is of dubious substantive import. Unlike most plaintiffs challenging similar regulations, *e.g., J.L. Spoons, Inc. v. Dragani*, 538 F.3d 379, 381-82 (6th Cir. 2008), Plaintiffs do not introduce their own expert findings or studies, but rely on a private investigator and their own or their attorney's summaries of police incident reports and property value assessments. Even if we were to accept this information as authoritative, its probative value is minimal because elementary rules of logic and empirical inference preclude the conclusions Plaintiffs urge.

Plaintiffs argue that an affidavit signed by their attorney contains evidence that no decrease in property values was caused by some of the businesses. The affidavit contains property values set by the Knox County Tax Assessor for properties around Richland and Raymond's, and for properties around "various establishments which provide and distribute adult videos as well as provide adult dancing" for years 1997, 2001, and 2005. However, we are told nothing about how the 13% increase in property values over the period of eight years around Richland and Raymond's shown in the affidavit compares to the changes in property values elsewhere in Knox County. An absolute increase in property values says nothing about Richland's or Raymond's impact on those property values, because we do not observe the counterfactual (i.e., what those values would be if Richland were not located there), nor do we observe the changes in property values in similar locations, or in any location, not near a sexually oriented business. Nor can we conclude anything about the trends in property values prior to 1997 – and Plaintiff Richland has been in operation at its present site for over twenty years, operating as an off-site consumption establishment since about 1990. Appellants' Br. at 6. Likewise, we cannot know whether the proffered "various establishments which provide and distribute adult videos as well as provide adult dancing" are representative of all such establishments in Knox County, and therefore, we can conclude nothing about the impact on property values of the whole category of businesses.

Further, Plaintiffs submit a summary of "[p]olice incident reports from the period January 1, 2000 through May 2005 of video stores with large adult sections of sexually explicit videos described in the Affidavit of [Plaintiffs'] investigator to demonstrate the lack of any negative secondary effects on [sic] video stores with as little as 35% [of inventory consisting of sexually-explicit materials] as defined in the Ordinance." Appellants' Br. at 11. The affidavit composed by a private investigator hired by Plaintiffs contains only general descriptions of the businesses, such as would be readily observable by a customer. There is little in the affidavit that allows us to conclude that all or most businesses selected meet any one of the 35% thresholds in the Ordinance or whether each or any of them barely clears, or vastly exceeds, the 35% threshold. Merely stating that a video store had an inventory of "approximately 4,000 sexually explicit videos," for example, says nothing about the percentage of the total inventory these videos comprise.

It is unnecessary for us to go through every piece of evidence Plaintiffs offer in an attempt to cast doubt on the County's findings and rationale. While the County may rely on evidence from other locations and anecdotal evidence, Plaintiffs' burden is heavier and cannot be met with unsound inference or similarly anecdotal information. Giving Plaintiffs' evidence the most charitable treatment, it suggests merely that the County "could have reached a different conclusion during its legislative process" with regard to the need to regulate some categories of sexually oriented businesses. *See Daytona Grand, Inc. v. City of Daytona Beach*, 490 F.3d 860, 881 (11th Cir. 2007). As the district court and the County point out, evidence suggesting that a different conclusion is also reasonable does not prove that the County's findings were impermissible or its rationale unsustainable. *Ibid.*; *Turner Broad. Sys.*, 520 U.S. at 211 (stating that in the context of intermediate scrutiny, conflicting evidence should not lead the court to "re-weigh the evidence de novo"); *G.M. Enters.*, 350 F.3d at 639 ("Although this evidence shows that the [town government] might have reached a different and equally reasonable conclusion regarding the relationship between adverse secondary effects and sexually oriented businesses, it is not sufficient to vitiate the result reached

in the . . . legislative process."). While Plaintiffs claim to have produced evidence disproving that their establishments are associated with lower property values or higher crime rates, the Ordinance is supported by evidence to the contrary. For example, contra Plaintiffs' claim that Raymond's cabaret is not associated with higher crime, the County relied on several studies and judicial decisions attesting to such an association: *e.g.,* a 1997 Houston study, a 1977 Los Angeles study, police investigations of crimes and unsanitary conditions at adult cabarets in nearby Chattanooga, and judicial findings of prostitution at same, *DLS, Inc. v. City of Chattanooga*, 894 F. Supp. 1140, 1146 (E.D. Tenn. 1995), aff'd 107 F.3d 403. Contra Plaintiffs' claim that Richland and Adult Video produce no adverse secondary effects, the County relied on several studies and testimonial evidence, such as those we noted above. Plaintiffs' unsystematic and eclectic collection of information is insufficient to cast direct doubt on the relevance of the evidence relied on by the County, or the County's rationale in enacting the Ordinance. For these reasons, we conclude Plaintiffs did not meet their burden of casting direct doubt on the factual findings or rationale underlying the County's Ordinance.

## C

Plaintiffs' second argument combines an as-applied and a facial challenge to the Ordinance's regulatory reach. Plaintiffs challenge the definition of "semi-nudity," which is part of the definition of "adult cabaret," the definition of "nudity," the prohibition on the sale or consumption of alcohol, and the definition of "adult motel" as not narrowly tailored and/or overbroad.

As we discussed above in section III.A, time, place, and manner regulations of speech must be narrowly tailored to serve the government's legitimate, content-neutral interests. Narrow tailoring means that the "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals," but it does not require that the means chosen "be the least restrictive or least intrusive means" of serving its goals. *Ward*, 491 U.S. at 799. "Rather, the

requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *DLS, Inc.*, 107 F.3d at 412 (quoting *Ward*, 491 U.S. at 799).

**Adult Cabaret**. Plaintiffs argue that the definition of "adult cabaret," insofar is it incorporates the definition of "semi-nudity," is not narrowly tailored, and that the district court erred in denying their motion for partial summary judgment on this issue. Plaintiff Raymond's is an adult cabaret under the Ordinance and has standing to challenge this provision.

Plaintiffs claim that the definition of "semi-nudity" unreasonably subjects to the licensing and regulatory requirements businesses, whose performers wear more than pasties and g-strings. Plaintiffs explain that pasties show "the female breast below a horizontal line across the top of the areola" and a g-string shows buttocks, which makes a pasties-and-g-string ensemble insufficient to avoid the definition of semi-nudity – and thus, the regulatory reach of the Ordinance. Appellants' Br. at 41. Subjecting such performances to regulation, Plaintiffs argue, does not serve the government's legitimate interest in controlling secondary effects and needlessly abridges the erotic expression communicated by the performers.

We recognize that "nude or nearly [nude]" dancing conveys "an endorsement of erotic experience," and is a protected form of expression "in the absence of some contrary clue." *DLS, Inc.*, 107 F.3d at 409 (quoting *Barnes*, 501 U.S. at 581 (Souter, J., concurring in the judgment)). We need not adopt the district court's determination that "the Ordinance goes no further than regulating businesses in which dancers wear pasties and g-strings," in order to conclude that the Ordinance is narrowly tailored.

We have previously upheld various time, place, and manner regulations of businesses featuring performers clad in revealing garments that nonetheless cover more than the pubic area and areolae. In *DLS, Inc.*, this court considered a Chattanooga City ordinance that defined "adult cabaret" in a similar, if not even more far-reaching manner:

an establishment which features as a principle [sic] use of its business, entertainers and/or waiters and/or bartenders who expose to public view of the patrons within said establishment, at any time, *the bare female breast below a point immediately above the top of the areola*, human genitals, pubic region, *or buttocks, even if partially covered by opaque material or completely covered by translucent material*; including swim suits, lingerie or latex covering. Adult cabarets shall include commercial establishments which feature entertainment of an erotic nature including exotic dancers, strippers, male or female impersonators, or similar entertainers.

*DLS, Inc.*, 107 F.3d at 406 (emphasis added). In *Sensations, Inc.*, this court upheld a Grand Rapids regulation of sexually oriented businesses that restricted the activities of semi-nude performers, where semi-nudity was defined in terms identical to the ones under consideration. 526 F.3d at 294. True, the plaintiffs in those cases did not emphasize the same argument Plaintiffs here make – namely, that "adult cabarets should be allowed to decide whether they want to be licensed and offer dancers wearing g-strings and pasties," or "be free of licensing requirements and the other regulations in the Ordinance . . . by wearing slightly more clothing." Appellants' Br. at 43. However, in the course of validating licensing and other regulations, we necessarily affirmed the constitutionality of burdening establishments that feature similarly defined "semi-nude" erotic dancing. *DLS, Inc.*, 107 F.3d 403 (upholding a licensing requirement and a requirement of a "six-foot buffer zone" between performers of adult cabarets and customers, employees, or other entertainers); *Sensations, Inc.*, 526 F.3d at 294 (upholding, inter alia, a "six-foot buffer zone," a "no-touching" rule between performers and audience, and a limitation on business hours).

Plaintiffs' proposition that the County cannot constitutionally regulate expressive conduct involving performers who wear more cloth than pasties and g-strings is unsupported. Plaintiffs' appeal to *R.V.S., L.L.C. v. City of Rockford* is misplaced. 361 F.3d 402 (7th Cir. 2004). *R.V.S.* is distinguishable on a number of grounds: there, the court invalidated a zoning and licensing regulation of establishments featuring "clothed" exotic dancers. Moreover, the ordinance before that court did not rely on any evidence, local or not, and it did not contain any legislative findings or reasoning to support the

connection between "exotic dancing nightclubs," as distinct from sexually oriented businesses, and secondary effects. *Id*. at 411. By contrast, the County relied on, inter alia, our decision in *DLS, Inc*. and a Fifth Circuit decision that considered a challenge to a zoning ordinance as applied to an adult cabaret whose dancers performed semi-nude – wearing more than nothing, but less than a bikini. *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471 (5th Cir. 2002). That court determined that in view of the secondary effects studies relied on by Dallas – and now by Knox County, "it was reasonable for the City to conclude that establishments featuring performers in attire more revealing than bikini tops pose the same types of problems associated with other [sexually oriented businesses]." *Id.* at 482. Similarly, the County's legislative determination that regular semi-nude performances (as defined by the Ordinance) are as liable to produce unwanted secondary effects as other sexually oriented businesses was reasonable, in view of the secondary effects evidence the County examined. Because that determination is reasonable, the regulation of cabarets featuring semi-nude performers does not impose a "substantial portion of the [regulatory] burden" on protected speech without advancing the goals of the Ordinance; on the contrary, the Ordinance promotes a substantial government interest that would be achieved less effectively absent the regulation.

Finally, Plaintiffs' invocation of the Supreme Court's jurisprudence regarding public nudity and nude dancing is inapposite: both *Barnes* and *Pap's A.M.* upheld bans on "nudity" and the concomitant requirement that erotic performers wear *at least* pasties and g-strings, reasoning that this limitation effected a minimal restriction on the erotic expression contained in nude dancing. Neither case may be read to suggest the unconstitutionality of regulating semi-nude performances as defined by the Ordinance, or to suggest that pasties and g-strings are the most intrusive requirement that may be constitutionally imposed.

**Nudity**. Next, Plaintiffs claim that the definition of prohibited "nudity" is not narrowly tailored because, in their interpretation of the Ordinance's terms, a person wearing only a g-string and pasties would violate that prohibition. Appellants' Br. at 48-

49. Plaintiff Raymond's is an adult cabaret that has featured nude dancing in the past, and therefore has standing to challenge this provision.

We have previously upheld a similar, if not identically-worded, prohibition on nudity in sexually oriented establishments. In *Sensations, Inc.*, we upheld a prohibition on nudity defined as "the knowing or intentional live display of a human genital organ or anus with less than a fully opaque covering or a female's breast with less than a fully opaque covering of the nipple and areola." 526 F.3d at 294. This court explained that "[t]he prohibition of full nudity has been viewed as having only a de minimis effect on the expressive character of erotic dancing." *Id*. at 299 (citing *Pap's A.M.*, 529 U.S. at 301; *Barnes*, 501 U.S. at 572 (plurality opinion)). While erotic dancing, whether performed in the "nude or nearly so," is a protected expressive activity, the state of nudity itself is not inherently expressive. *See DLS, Inc.*, 107 F.3d at 409. Because nudity itself is not essential to the eroticism that brings dancing under the protection of the First Amendment, the plurality in *Pap's A.M.* rejected Justice Stevens's position that a ban on public nudity effects a "complete ban on expression" by incidentally banning nude dancing. *Sensations*, 526 F.3d at 299 (quoting *Pap's A.M.*, 529 U.S. at 292-93). Instead, it merely "limit[s] one particular means of expressing the kind of erotic message being disseminated." *Ibid*.

Because the City of Erie justified its ordinance both as a regulation of general conduct incidentally restricting expression and as a restriction of expression aimed at its secondary effects, the Supreme Court scrutinized both rationales. The Court conceded that banning nudity and nude dancing may not be the most effective or the least restrictive means of combating secondary effects of adult establishments, but that the Constitution requires neither to survive intermediate scrutiny. *Pap's A.M.*, 529 U.S. at 301-02 (holding that the "restriction is no greater than is essential to the furtherance of the government interest," and that it "leaves ample capacity to convey the dancer's erotic message," even if it is not the least restrictive means to address the problem).

Plaintiffs seem to suggest that the definition of nudity in the Ordinance is broader than constitutionally permissible because donning a g-string, which they claim does not cover the "anal cleft," does not take a performer out of the state of nudity. The County on the other hand, "has consistently maintained that pasties and G-strings . . . constitute sufficient covering to comply" with the Ordinance. Appellee's Br. at 51. We need not weigh in on the dispute between the parties as to the amount of fabric required to cover the "anal cleft"; however, we see no reason not to accept the County's limiting construction of its own regulation and we presume that the County will continue to abide by its stated interpretation in its enforcement efforts.[6] We are unconvinced that defining nudity in terms of exposing the "anus, anal cleft or cleavage," however anatomically or linguistically awkward, takes us beyond the territory controlled by our holding in *Sensations*. Moreover, the Erie ordinance upheld by the Supreme Court contained an even broader definition of nudity. *Pap's A.M.*, 529 U.S. at 284 (Ordinance defined nudity to mean, inter alia, "the showing of the human male or female genital [sic], pubic hair or *buttocks with less than a fully opaque covering*." (emphasis added)).[7] We conclude that the prohibition on "nudity" in sexually oriented establishments, as defined in the Ordinance, does not burden substantially more expression than necessary to advance the County's objective, and is thus narrowly tailored.

Moreover, the provisions involving semi-nudity and nudity survive intermediate scrutiny because they do not serve to restrict unreasonably the capacity to engage in the protected expression embodied in erotic dance. Under the Ordinance, adult cabarets have a choice: establishments may opt for pasties and g-strings, which the Supreme Court has described as having a minimal effect on the message conveyed by completely

---

[6]It is worth noting that a rigidly literal interpretation may be stretched unreasonably – and surely beyond what the County intends. For example, it could be extended to keep out patrons who are wearing the currently commonplace low-rise jeans that tend to reveal the top of the "anal cleft or cleavage" in a seated position, not to mention an occasional plumber. We do not intend to approve such an interpretation of the regulation.

[7]It is also worth noting that notwithstanding a comparatively broad definition of nudity that applies whenever "buttocks" are uncovered, the plurality in *Pap's A.M.* interpreted the ordinance narrowly – as the County and the district court do in the present case – to allow performances in pasties and g-strings. *Pap's A.M.*, 529 U.S. at 294 (stating that "dancers at Kandyland and other such establishments are free to perform wearing pasties and G-strings").

nude dancing, *Pap's A.M.*, 529 U.S. at 301, and comply with the reasonable restrictions of the Ordinance. Or, establishments may outfit their employees in sufficient cloth to cover "the female breast below a horizontal line across the top of the areola" and the buttocks – which appears to be easily accomplished by most bikinis – and escape regulation altogether. This choice leaves adult cabarets with ample means of conveying the message contained in erotic dancing, even if it is not the least restrictive means to target adverse secondary effects.

**Adult motel.** Plaintiffs also challenge the definition of "adult motel" as not narrowly tailored. However, none of the Plaintiffs have standing to bring an as-applied challenge to this provision.

**Prohibition on the sale or consumption of alcohol**. Finally, Plaintiffs argue that the prohibition on the sale, use or consumption of alcohol on the premises of sexually oriented businesses is not narrowly tailored. The County submits that Plaintiffs also lack standing to challenge this prohibition because the record does not establish that any of them have a liquor license or intend to seek a liquor license. Assuming without deciding that Raymond's, being representative of most adult cabarets, has standing to challenge this provision, we agree with the district court's conclusion that this prohibition is "a reasonable restriction narrowly tailored to limit the secondary effects of crime." In finding that sexually oriented businesses as a category are associated with numerous adverse secondary effects, the County reasonably relied on a number of prior judicial decisions finding sufficient evidence to support the connection between adverse effects and adult entertainment when combined with alcohol consumption. *E.g., Ben's Bar, Inc.*, 316 F.3d at 725 (holding that prohibition of alcohol in adult entertainment venues "is, as a practical matter, the least restrictive means of furthering the Village's interest in combating the secondary effects resulting from the combination of adult entertainment and alcohol consumption").

**Facial Challenge on Overbreadth Grounds.** Plaintiffs next challenge the Ordinance on grounds that any one or combination of the same provisions attacked as

not narrowly tailored render the Ordinance unconstitutionally overbroad. A law that is overly broad "proscribe[s] a 'substantial' amount of constitutionally protected speech judged in relation to the statute's plainly legitimate sweep." *J.L. Spoons, Inc.*, 538 F.3d at 383 (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)). Overbroad laws warrant the dramatic remedy of invalidation to "allay the concern that the threat of enforcement of [such a] law may deter or chill constitutionally protected speech." *Ibid*. However, the Supreme Court has been explicit that the overbreadth doctrine is not to be "casually employed." *United States v. Williams*, __U.S.__, 128 S. Ct. 1830, 1838 (2008). "Substantial social costs" are incurred by preventing the "application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct." *Hicks*, 539 U.S. at 119. Thus, the Court has "vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 128 S. Ct. at 1838. To succeed in a facial-overbreadth challenge, Plaintiffs must "demonstrate from the text of [the statute] and from actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally." *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988). This Plaintiffs fail to do. Plaintiffs offer no arguments or evidence in support of their overbreadth claims beyond those proffered in support of their as-applied challenges. Since we find that Plaintiffs failed to show that protected speech is impermissibly burdened by any of the provisions challenged as applied, these same provisions cannot form the basis for a successful overbreadth attack.

**D**

Third, Plaintiffs argue that the Ordinance is an unconstitutional prior restraint because it "denies access in the future to non-obscene material based on a past conviction." Appellants' Rep. Br. at 38. A licensing scheme such as the Ordinance is indeed a prior restraint on protected expression. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (plurality opinion); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554 (1975); *Odle v. Decatur County*, 421 F.3d 386, 389 (6th Cir. 2005); *Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville & Davidson County*, 274 F.3d

377, 400 (6th Cir. 2001).  However, prior restraints are not unconstitutional per se. *Odle*, 421 F.3d at 389.  Where, as here, license issuance, suspension, and revocation are based on explicit and objective criteria, *see* Secs. 5(a), 9, 10, and are not left to unbridled discretion, a licensing scheme does "not present the grave dangers of a censorship system." *City of Littleton v. Z.J. Gifts D-4, L.L.C*, 541 U.S. 774, 783 (2004) (internal quotation marks and citations omitted).  We recently summarized the inquiry into the constitutionality of such regulations:

> The Supreme Court has long required prior restraint licensing schemes to guarantee applicants a prompt final judicial decision on the merits of a license denial and preservation of the status quo while an application or judicial review of a license denial is pending. *Freedman v. Maryland*, 380 U.S. 51, 58 (1965); *FW/PBS, Inc.*, 493 U.S. at 229-30; *City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 779-80 (2004).  In the seminal *Freedman* decision, the Supreme Court suggested that a licensing scheme must place the burden of proof as to whether an applicant's form of expression is protected on the government.  380 U.S. at 58.  However, it now appears that *prompt judicial review* and *preservation of the status quo* are the only constitutionally indispensable procedural safeguards.  *FW/PBS, Inc.*, 493 U.S. at 228; *Deja Vu of Nashville*, 274 F.3d at 400-401 . . . .

*Odle*, 421 F.3d at 389-90 (emphasis added) (parallel citations omitted).  The Ordinance satisfies both requirements.  The Ordinance provides for prompt judicial review of a revoked license.  Sec. 11.  The Ordinance also provides for the preservation of the status quo while a license application is pending and while an appeal from a revocation of the license is pending: Sec. 5(a) states that a Temporary License shall be issued to an applicant within 24 hours, valid until a decision to grant or deny a license has been made, which is to occur within 20 days of application; and Sec. 11(b) states that a Provisional License shall be issued to any business initiating court action to challenge a license denial, suspension or revocation.  Even if we presume that Plaintiffs have standing to challenge the standards for license revocation or suspension, their challenge fails.  We affirm the district court's determination that the Ordinance is not an unconstitutional prior restraint.

**E**

Fourth, Plaintiffs argue that the limitation on hours of operation enacted by the Ordinance is preempted by state law.  The Ordinance provides that sexually oriented businesses cannot do business before 8 a.m. or after midnight Monday through Saturday, and they cannot do business on Sundays or legal holidays.  The Tennessee Adult-Oriented Establishments statute ("Tennessee Statute") sets identical business-hour limitations, Tenn. Code Ann. § 7-51-1402, but exempts "establishment[s] that offer[] only live, stage adult entertainment in a theatre, adult cabaret, or dinner show type setting," § 7-51-1405.  The Tennessee Statute also allows local ordinances to further limit opening hours but disallows local ordinances that "extend" business hours. § 7-51-1402 (b).  Plaintiffs argue that because adult cabarets were exempted from the state limitations on business hours, the County cannot nullify that exemption by enacting its Ordinance.  Plaintiffs' argument is without merit. Prior to July 1, 2007, the Tennessee Statute, in a section entitled "Local laws not preempted," stated:

> Nothing in this chapter shall preempt or prevent political subdivisions in this state from enacting and enforcing other lawful and reasonable restrictions, regulations, licensing, zoning and other civil or administrative provisions concerning the location, configuration, code compliance or other business operations or requirements of adult-oriented establishments and sexually-oriented businesses.[8]

§ 7-51-1406.  The Tennessee statute clearly allows the County to enact and enforce restrictions concerning business operations of "adult-oriented establishments and sexually-oriented businesses."  Plaintiffs' reading of "other lawful and reasonable restrictions" and "other civil or administrative provision" to mean "[other than] local restrictions on hours of operations for adult cabarets," Appellants' Br. at 50, is untenable, as it twists a non-preemption clause into a preemption clause.  We affirm the conclusion of the district court that the County Ordinance is consistent with and is not preempted by the Tennessee Statute.

---

[8]The 2007 amendments to this section do not alter the provision in a manner material to the issue.

**IV**

On cross-appeal, the County argues that the district court erroneously ordered the severance of two crimes from the civil disability provisions of the Ordinance. The court held that the denial of a license to persons convicted of dealing in controlled substances and racketeering is unjustified because these crimes "are not related to the crime-control intent of the Ordinance which is to reduce crimes of a sexual nature."

The County argues that Plaintiffs lack standing to challenge the civil disability provisions of the Ordinance because none of the Plaintiffs were ever convicted of any of the specified crimes. Plaintiffs make no allegations to the contrary; in fact, Plaintiffs themselves state that no one affiliated with them has been convicted of any of the specified crimes. Appellants' Rep. Br. at 8. Because this claim was litigated and adjudicated as an as-applied challenge, we conclude that the County's argument is sound. *See FW/PBS, Inc.*, 493 U.S. at 235 (concluding that "no petitioner has shown standing to challenge . . . the civil disability provisions" of an ordinance regulating sexually oriented businesses, and that therefore, "the courts below lacked jurisdiction to adjudicate petitioners' claims with respect to those provisions"); *Deja Vu of Cincinnati, L.L.C.*, 411 F.3d at 794-95 (holding that plaintiffs cannot challenge a civil disability provision of an Ohio licensing scheme for sexually oriented businesses because they have not alleged sufficient injury in fact to establish standing). For these reasons, we reverse the district court's decision as to the severance of the two crimes from the civil disability provision.

**V**

Therefore, we AFFIRM the district court's grant of summary judgment in favor of the County, and REVERSE the grant of partial summary judgment in favor of Plaintiffs.